[No. B079219. Second Dist., Div. Six. Mar. 7, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES MICHAEL LINKENAUGER, Defendant and Appellant.

## COUNSEL

Gilbert W. Lentz, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Sharon Wooden-Richard and Stephen M. Kaufman, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**YEGAN, J.**—We again confront a situation that, unfortunately, is becoming all too common, domestic violence culminating in murder. We revisit our earlier opinion in *People v. Zack* (1986) 184 Cal.App.3d 409 [229 Cal.Rptr. 317] (*Zack*) and conclude that it remains "good law" after the California Supreme Court opinion in *People v. Ewoldt* (1994) 7 Cal.4th 380 [27 Cal.Rptr.2d 646, 867 P.2d 757] (*Ewoldt*).

James Michael Linkenauger was convicted in a jury trial of first degree murder and sentenced to state prison for 25 years to life. (Pen. Code, §§ 187, subd. (a), 189.) The People's theory was that appellant tortured and strangled his wife, JoAnn Linkenauger, following a two-year marriage punctuated by appellant's use of physical force on her. Appellant contends that the trial court erred in admitting evidence of marital discord and his prior assaults upon his wife and failed to properly instruct the jury with respect thereto. We reject the contentions and affirm the judgment.

### CHARGED OFFENSE FACTS

On January 18, 1993, Ventura County Deputy Sheriff Robert Hull found JoAnn Linkenauger's body in a barranca near Highway 118. The barranca was approximately seven miles from the Linkenauger residence in Moorpark. JoAnn was clothed in a nightgown and wearing a pair of men's jeans that were pulled down to her knees. Her car was parked on the side of the road, stuck in the mud. A pair of latex gloves were nearby. Traces of JoAnn's blood and hair were in the trunk and a bloody glove print was on the trunk.

The medical examiner determined that JoAnn was strangled to death Sunday night, January 17, 1993, or early Monday morning. She had a cluster of bruises and abrasions on her neck. The grippings on her neck were so forceful that both sides of JoAnn's voice box were fractured. This force also caused her to defecate. The medical examiner opined that JoAnn was acutely aware of the pain before her death and that it took her five to ten minutes to die.

JoAnn also sustained 15 blunt-type injuries to the head, mouth, and arms, causing her to lose 2 pints of blood. Some of the injuries were consistent

with being struck with a fist or slammed against a wall or floor. The scrapes, contusions, and defensive wounds on the arms and legs further indicated that she had been grabbed and dragged.

Appellant's wristwatch was found in JoAnn's vehicle and had blood smeared on the inside of the watch band. Detectives Patrick Buckley and Richard Gatling interviewed appellant at his residence on January 18, 1993. Appellant's right hand was swollen, red, cut, and scratched. The ring finger on his left hand had a fresh cut. Detective Buckley observed bleach and paint spots on the brown carpet at the Linkenauger residence.

Appellant gave four taped statements and denied that he had killed JoAnn. Appellant stated that he (1) last saw JoAnn on Friday; (2) went to the Moorpark Moose Lodge on Sunday and got drunk; and (3) walked home in the rain, took a shower, and went to bed at 10 p.m.

The neighbors, however, heard a scream from the Linkenauger residence at approximately 10:30 p.m. on January 17, 1993. Nora Reynoso looked out her window and saw appellant dragging a woman by the hair toward the garage. The woman was screaming and holding onto appellant's hands.

Molly Garden, who lived behind appellant's house, also heard screams. Garden peered through a window and saw appellant squatting in the kitchen. He was not wearing a shirt and was making back and forth movements with his arms.

A subsequent search of the Linkenauger residence revealed bloodstains on the walls, the brown carpet, the front screen door, the door jamb, the entertainment center, the television, the VCR, and the telephone. Blood was in the bathroom sink trap and on the shower door handle. Sheriff's crime lab technicians detected hundreds of blood spatters in the living room, bathroom, master bedroom, and kitchen. A garbage bag in the kitchen had blood on it and a piece of human fecal matter. Traces of blood, brown paint, and bleach were on the living room carpet.

Sheriff's investigators found a bottle of bleach and a can of brown spray paint above the dryer in the garage. JoAnn's jeans, a teal turtleneck sweater, and a man's shirt and jeans were in the dryer. The laundry basket next to the dryer had a towel and two pairs of bloodstained men's undershorts.

JoAnn's tennis shoes and shattered pieces of a glass coffee table were on the back porch. Detectives also found a pair of bootstraps and a cellophane "Boot Factory" bag in the spare bedroom. JoAnn purchased the bootstraps

Sunday afternoon while driving back from Las Vegas with Rodney and Susan Cooper. JoAnn had dinner with the Coopers Sunday evening and left Burbank at 7 p.m. to drive back to Moorpark. The Coopers told investigators that she was wearing a cardigan sweater, a teal turtleneck, blue jeans, and tennis shoes.

When appellant was arrested and booked for JoAnn's murder, the police noticed and photographed a two-inch laceration on appellant's scrotum. Appellant said that he injured himself on a zipper. However, the medical examiner who performed the autopsy on JoAnn, indicated that the fingernail on JoAnn's middle finger was broken off. The doctor opined that the scratch on appellant's scrotum was consistent with a scraping and pulling by a fingernail.

Loren Hillard read about the murder and recognized appellant's photograph in the newspaper. On January 18, 1993, at approximately 2 a.m., Hillard and two companions gave a ride to appellant, who was walking in the rain along Highway 118. Appellant was soaking wet and asked Hillard to drop him off at the Hughes Market in Moorpark, a block from appellant's house.

As indicated, the prosecution's theory was that appellant committed a premeditated murder by torturing and strangling JoAnn which was the culmination of marital discord and jealousy. On the weekend she was murdered JoAnn told appellant that she was going to San Francisco to attend a food show. Instead, she went to Las Vegas with the Coopers. Appellant was jealous, angry, and believed that JoAnn was having an affair. When friends asked about JoAnn, appellant told them that she was ". . . in San Francisco . . . [having sexual intercourse with] some guy." Sunday afternoon, appellant went to the Moose Lodge wearing a fake Rolex watch, the same watch that was later found in JoAnn's car. Appellant told the bartender that ". . . before the night was over, he was going to blow someone's head up." Appellant made the statement five or six times and left the Moose Lodge around 8:30 p.m.

### TRIAL COURT RULING ON PRIOR MISCONDUCT

The prosecution, in its case-in-chief and relying almost exclusively on *Zack*, moved to introduce evidence concerning marital discord and appellant's prior assaults against JoAnn. The trial court, over appellant's objection, admitted the evidence on the issues of intent, motive and identity. The trial court said that this evidence could be ". . . offered to show the violent nature of the relationship, to show that at the time that this crime occurred,

he had a motive to kill her, that he planned to kill her, and that he intended to kill her and that he intended to inflict torture and great pain upon her . . . ."

## DOMESTIC VIOLENCE EVIDENCE

The evidence of marital discord and physical assaults can be grouped into four areas. First, Susan Cooper and Melody Hanna testified that they observed bruises on JoAnn's face, neck, and arms in 1990, 1991, and 1992.

Second, Victoria Anderson, a waitress, Toni Moorman, and Deputy Sheriff Richard Barnes testified about an October 1992 altercation at a Denny's restaurant. Appellant beat JoAnn and left her in the parking lot. JoAnn's physician, Doctor Jane Lindberg, testified that JoAnn sustained injuries to her hip, back, and neck as a result of this assault.

Third, Matt Carrasco testified that appellant accused him of having an affair with JoAnn two or three weeks before the murder. The Thursday before JoAnn's death, Carrasco witnessed an argument between appellant and JoAnn at the International House of Pancakes. JoAnn told appellant that she was going to San Francisco to attend a weekend seminar. Appellant insisted on packing her clothes and told her that she could not take her curling iron, makeup, or miniskirt. JoAnn was upset because appellant would not let her shave her legs.

Fourth, JoAnn obtained domestic violence restraining orders in June 1990 and October 1992. Appellant was ordered to "not attack, strike, threaten, batter or disturb the peace" of JoAnn.

## GENERAL RULES

Character evidence is not admissible to show conduct on a specific occasion. (Evid. Code, § 1101, subd. (a).) This type of evidence is sometimes referred to as criminal disposition or propensity. (E.g., *People* v. *Sam* (1969) 71 Cal.2d 194, 203 [77 Cal.Rptr. 804, 454 P.2d 700].) The rule, however, is qualified by Evidence Code section 1101, subdivision (b), which provides: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, . . . intent, . . . identity, . . .) other than his or her disposition to commit such an act."

Admission of Evidence Code section 1101, subdivision (b) evidence is addressed to the sound discretion of the trial court. The trial court may

exclude or admit this type of evidence pursuant to Evidence Code section 352 which provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." The trial court's determination will not be disturbed on appeal absent a clear showing of an abuse of discretion. (E.g., *People* v. *Gordon* (1990) 50 Cal.3d 1223, 1239 [270 Cal.Rptr. 451, 792 P.2d 251]; *People* v. *Hayes* (1990) 52 Cal.3d 577, 617 [276 Cal.Rptr. 874, 802 P.2d 376].)

■ A plea of not guilty puts into issue all of the elements of the charged offense, including intent. (*People* v. *Balcom* (1994) 7 Cal.4th 414, 422-423 [27 Cal.Rptr.2d 666, 867 P.2d 777]; *People* v. *Daniels* (1991) 52 Cal.3d 815, 857-858 [277 Cal.Rptr. 122, 802 P.2d 906].)

### Pre-*Ewoldt* Supreme Court Precedent

Pre-*Ewoldt* Supreme Court precedent demonstrates that the trial court did not err when it admitted marital discord and prior assault evidence. ■ The general rule is restated by our Supreme Court as follows: "Evidence tending to establish prior quarrels between a defendant and decedent and the making of threats by the former is properly admitted . . . to show the motive and state of mind of the defendant. . . ." (*People* v. *Cartier* (1960) 54 Cal.2d 300, 311 [5 Cal.Rptr. 573, 353 P.2d 53].)

The same rule has been applied in other Supreme Court cases. For example, in *People* v. *De Moss* (1935) 4 Cal.2d 469 [50 P.2d 1031], the trial court admitted evidence that during the year before the defendant's murder of his wife, he had been abusive to her. Defendant also made threats against her. The California Supreme Court indicated that the ". . . quarrels and separations of the parties, together with the threats of defendant, establish sufficient motive for the killing . . . ." (*Id.*, at p. 473.)

Similarly in *People* v. *Chaves* (1898) 122 Cal. 134 [54 P. 596], the defendant quarreled with his girlfriend five days before he murdered her. The California Supreme Court said that such evidence was admissible: "It showed that defendant and deceased while living together had quarreled, resulting in her leaving him and fleeing to a neighbor's house for protection, in his following her and attempting to make a murderous assault upon her, and in his making threats against her when his assault was frustrated. This tended to show malice and ill-will on his part, and a motive for the murder committed a few days later." (*Id.*, at p. 143.)

Application of this rule also impinges on the issue of identity of the person who committed the charged offense. Evidence of motive may " '. . .

solve a doubt, . . . "as to the identity of the slayer, . . ." [and] is admissible against a defendant, however discreditably it may reflect on him, and even where it may show him guilty of other crimes.' " (*People* v. *Weston* (1915) 169 Cal. 393, 396 [146 P. 871].)

## Daniels

In *People* v. *Daniels* (1971) 16 Cal.App.3d 36 [93 Cal.Rptr. 628], the defendant attempted to kill his estranged wife in a variety of ways. The prior assaults upon his estranged wife could not have survived a "distinctive modus operandi," "calling card," or "signature" analysis. In the charged offense, the defendant tried to murder his wife with a car bomb! Prior thereto, he assaulted her with a knife and a gun, and tried to jettison her off of a cliff.

Were we to credit appellant's theory, defendant's prior assaults would only have been admissible on the issue of identity if they were accomplished by bombs or some other "signature" evidence. In *Daniels*, the court observed that ". . . evidence of motive to commit an offense is evidence of the identity of the offender. [Citations.]" (16 Cal.App.3d at p. 46.)

*People* v. *Daniels* is an apt illustration of why we distilled the *Zack* rule. On the issue of identity, the inference that Mr. Daniels was responsible for the car bomb was compelling. It was rooted in "common sense, experience and logic." (*Zack*, 184 Cal.App.3d at p. 414.) As phrased by our California Supreme Court, such evidence may be admissible if ". . . it tends logically, naturally, and by reasonable inference, to establish any fact material for the People . . . ." (*People* v. *Sam*, *supra*, 71 Cal.2d 194, 203.)

After the car bomb nearly killed Mrs. Daniels, the immediate focus must have been on Mr. Daniels. Logic compels the inference. Indeed, it would have been unreasonable for the police not to have immediately suspected him. He had thrice demonstrated his intent to kill her. It would be equally unreasonable, from an evidentiary point of view, not to permit the jury to draw the same inference without resort to a "signature" analysis. A rule not allowing prior assaults when the persistent assailant simply varies the mode of attack would only reward creativity.

## Zack

In *Zack*, the defendant had a "stormy" two-year romantic relationship with his girlfriend, the decedent. Zack physically assaulted her on several occasions. When she moved out, Zack threatened to kill her. Thereafter, he beat and strangled her to death.

In *Zack*, we drew from certain California Supreme Court precedents and the Court of Appeal opinion in *People* v. *Daniels, supra,* 16 Cal.App.3d 36. ▪ We distilled the following rule: "Where a defendant is charged with a violent crime and has or had a previous relationship with a victim, prior assaults upon the same victim, when offered on disputed issues, e.g., identity, intent, motive, etcetera, are admissible based solely upon the consideration of identical perpetrator and victim without resort to a 'distinctive modus operandi' analysis of other factors." (*Zack, supra,* 184 Cal.App.3d 409, 415.)

### Ewoldt

Appellant contends that *Ewoldt, supra,* 7 Cal.4th 380 now compels a different rule. In *Ewoldt,* the defendant was convicted of molesting his stepdaughter. The trial court admitted testimony that the defendant had committed prior uncharged sexual offenses against the victim and victim's older sister.[1] The Supreme Court affirmed the judgment, and indicated that the prior molestations and charged offenses were sufficiently similar to support the inference that they were manifestations of a common design or plan. (7 Cal.4th at p. 403.) The Supreme Court did not expressly or impliedly overrule or disapprove of *Zack,* or the California Supreme Court precedents upon which it is premised.

*Ewoldt* indicated that varying degrees of similarity are required when evidence of prior misconduct is offered to show intent, common design or plan, or identity. "The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent. [Citation]. . . [¶] A greater degree of similarity is required in order to prove the existence of a common design or plan." (*Ewoldt, supra,* 7 Cal.4th at p. 402.) The court stated that "[t]he greatest degree of similarity is required for evidence of uncharged misconduct to be relevant to prove identity. For identity to be established, the uncharged misconduct and the charged offense must share common features that are sufficiently distinctive so as to support the inference that the same person committed both acts. [Citation.] 'The pattern and

---

[1] We hasten to observe that the Supreme Court did not analyze the facts in *Ewoldt* in terms of "identical perpetrator and identical victim." There are cases, of course, where even when there is an "identical perpetrator and an identical victim," there will be a "signature" type of crime. For example, in *People* v. *Haylock* (1980) 113 Cal.App.3d 146, 150 [169 Cal.Rptr. 658], the defendant had a penchant for butcher knives. Each of his prior assaults upon the victim were accomplished with a butcher knife. The last butcher knife attack was successful. Although the issue in *Haylock* was not the identity of the murderer, had it been, the "butcher knife" mode of assault would satisfy the "signature" test. However, that does not necessarily mean that the "signature" test is required where there is an "identical perpetrator and an identical victim."

characteristics of the crimes must be so unusual and distinctive as to be like a signature.' [Citation.]" (*Id.*, at p. 403.)

### *Ewoldt* Distinguishable

The California Supreme Court's ". . . statements of law remain binding on the trial and appellate courts of this state [citations] and must be applied wherever the facts of a case are not fairly distinguishable from the facts of the case in which [it has] declared the applicable principle of law." (*People* v. *Triggs* (1973) 8 Cal.3d 884, 890-891 [106 Cal.Rptr. 408, 506 P.2d 232].) The general rules promulgated in *Ewoldt* are not here controlling because the instant factual context is fairly distinguishable.

First, *Ewoldt* did not involve a "violent crime" as was the case in *Zack*, whose holding is strictly limited to a charged "violent crime." (*Zack, supra*, 184 Cal.App.3d at. p. 415, *ante*, at p. 1612.) Second, in *Ewoldt*, the issue was common design or plan which was not the case in *Zack*. Third, not even newly written Supreme Court precedent can alter the fact that no one can kill the same victim twice in a distinctive or "signature" fashion. (*Zack, supra*, 184 Cal.App.3d at p. 415; *Ewoldt, supra*, 7 Cal.4th at p. 403.)

The rule requiring a great degree of similarity for uncharged misconduct to prove identity, i.e., the "signature" test (7 Cal.4th at p. 403) had been mentioned by our California Supreme Court prior to *Zack*. (*People* v. *Haston* (1968) 69 Cal.2d 233, 245-246, fn. 14 [70 Cal.Rptr. 419, 444 P.2d 91].) As we indicated in *Zack*, we believe a broader range of evidence may be presented to show motive, intent, and identity where the prior misconduct and charged offense involves the identical perpetrator and victim. (*People* v. *Beamon* (1973) 8 Cal.3d 625, 633 [105 Cal.Rptr. 681, 504 P.2d 905]; see also *People* v. *Haston, supra*, 69 Cal.2d at pp. 249-250.) *Zack* survives *Ewoldt*.

### Inference of Intent and Identity

Appellant contends that evidence of marital discord and prior assaults does not support the inference that he intended to commit a premeditated murder. We disagree. This evidence had a tendency in reason to show appellant's intent to beat, torture, and ultimately murder JoAnn. It was properly admitted to show ill will and motive. (*People* v. *De Moss, supra*, 4 Cal.2d 469, 473; *People* v. *Daniels, supra*, 16 Cal.App.3d 36, 46.)

Evidence concerning marital discord and appellant's prior assaults also supports the inference that appellant committed the offense. "The inference

of identity, . . . need not depend on one or more unique or nearly unique common features; features of substantial but lesser distinctiveness may yield a distinctive combination when considered together. [Citation.]" (*People* v. *Miller* (1990) 50 Cal.3d 954, 987 [269 Cal.Rptr. 492, 790 P.2d 1289].) As we have indicated, by reason of the marital discord and his prior assaults upon JoAnn, the jury could logically draw the inference that appellant had again assaulted her.

### ABUSE OF DISCRETION

■ Equally unavailing is the argument that the trial court abused its discretion in admitting evidence of prior assaults and marital discord. The trial court, in overruling appellant's Evidence Code section 352 objection, carefully, methodically, and expressly articulated its thought process in weighing potential prejudice against probative value. Appellant has failed to demonstrate that the evidentiary ruling was arbitrary, whimsical, or capricious as a matter of law. (*Zack, supra,* 184 Cal.App.3d 409, 413.)

Appellant, however, contends that this evidence was cumulative and may have induced the jury to punish him for prior uncharged acts of domestic violence. We disagree. The evidence was not cumulative as a matter of law. The testimony concerning appellant's prior assaults "was no stronger and no more inflammatory than the testimony concerning the charged offenses." (*Ewoldt, supra,* 7 Cal.4th at p. 405.) The evidence was uncontroverted that appellant was jealous, angry, and repeatedly threatened to "blow someone's head up" before the night was over.

### ALLEGED JURY INSTRUCTION ERROR

■ Appellant finally contends that the trial court failed to correctly instruct the jury on the appropriate use of marital discord and prior assaults. The trial court gave a modified CALJIC No. 2.50 instruction which stated that this evidence could only be considered to show intent, identity or motive. The full instruction is as follows: "Evidence has been introduced for the purpose of showing that the defendant committed acts other than that for which he is on trial. [¶] Such evidence, if believed, was not received and may not be considered by you to prove that defendant is a person of bad character or that he has a disposition to commit crimes. [¶] Such evidence was received and may be considered by you only for the limited purpose of determining if it tends to show: [¶] The existence of the intent which is a necessary element of the crime charged; [¶] The identity of the person who committed the crime, if any, of which the defendant is accused; [¶] A motive for the commission of the crime charged; [¶] For the limited purpose for

which you may consider such evidence, you must weigh it in the same manner as you do all other such evidence in the case. [¶] You are not permitted to consider such evidence for any other purpose."

Appellant maintains that, under *Ewoldt*, the trial court was required to match the prior act evidence with each issue to be proven. We disagree. Such an instruction would have argumentative and repetitious of instructions already given. (*People* v. *Wright* (1988) 45 Cal.3d 1126, 1134-1135 [248 Cal.Rptr. 600, 755 P.2d 1049].) CALJIC No. 2.50 was and is a correct statement of the law. It tells the jury what inferences could be drawn from the marital discord and prior assault evidence. The jury was further admonished that the evidence had been admitted for a limited purpose (CALJIC No. 2.09) and "[y]ou are not permitted to consider such evidence for any other purpose." (CALJIC No. 2.50.) We reject the argument that the trial court had a sua sponte obligation to further instruct the jury.

### Conclusion

"Appellant was not entitled to have the jury determine his guilt or innocence on a false presentation that his and the victim's relationship . . . were peaceful and friendly." (*Zack, supra,* 184 Cal.App.3d at p. 415.) A trial is a search for the truth. Here the jury determined the truth: appellant threatened "to blow someone's head up" and did so. He tortured and strangled his wife to death after physically abusing her for two years.

The judgment is affirmed.

Stone (S. J.), P. J., and Gilbert, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 1, 1995.