Filed 5/10/18 (mod.); pub. order 4/20/18 follows unmodified opinion (attached)
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| DAVID FISCHER,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>JOANNIE FISCHER,<br><br>     Defendant and Respondent. | A148482<br><br>(San Mateo County<br>Super. Ct. No. FAM0127015 )<br><br>**ORDER MODIFYING OPINION<br>AND DENYING MOTION;<br>NO CHANGE IN JUDGMENT** |

**BY THE COURT:**

The opinion filed herein on March 23, 2018 is modified as follows:

The first paragraph on page two is modified to read: "David and Joannie were married in 1999.[1] They had two boys, now 16 and 12, and lived on Walsh Road in Atherton (the Walsh Road house)."

The first sentence of footnote five on page five is modified to read: "As indicated by her answer quoted above, to help David out Joannie had been taking care of their children extra days so David could travel more easily for work."

This modification does not effect a change in the judgment.

David's motion for use of anonymous names is denied.

Dated: _____           _____
                                                         Acting P.J.

1

Trial Court:    San Mateo County Superior Court

Trial Judge:    Hon. Rachel Holt

Counsel:

Walzer Melcher, Christopher C. Melcher, Edward M. Lyman for Plaintiff and Appellant.

California Appellate Law Group, Robert A. Roth, Ben Feuer for Defendant and Respondent.

Filed 3/23/18 (unmodified version); pub. order 4/20/18 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| DAVID FISCHER,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>JOANNIE FISCHER,<br><br>        Defendant and Respondent. | A148482<br><br>(San Mateo County<br>Super. Ct. No. FAM0127015) |

A 15-year marriage between appellant David Fischer and respondent Joannie Fischer had its "ups and downs," one down of which was David's affair—an affair he promised was "over." David nevertheless petitioned for dissolution; Joannie resisted; and the parties attempted reconciliation, in connection with which the trial court would later conclude David gave "conflicting messages." Meanwhile, Joannie heard David's phone, and saw a picture of the mistress. David walked in and confronted Joannie, who slapped him, scratching his neck, and in a subsequent confrontation grappling for the phone, shoved him. David moved for a domestic violence protective order. Following a lengthy hearing in which the court heard from seven witnesses, the court denied the request, in a thoughtful and comprehensive statement of decision. We affirm.

1

# BACKGROUND

## The General Setting

David and Joannie were married in 1999.[1]  They had two boys, N., now 16, and Z., now 12, both of whom have special needs.  They lived on Walsh Road in Atherton (the Walsh Road house).

Throughout their marriage, David and Joannie had what Joannie's brief describes as their "ups and downs."  And as the trial court would later find, neither of them always behaved in the most mature way.  Thus, and as described in Joannie's brief, "Joannie admitted that one time, when she was alone and frustrated, she broke a picture frame, and that another time, also while alone, knocked over a bowl.  Nobody was in the room with her on either occasion, and both incidents occurred more than eight months before the pivotal events of September 2015.  [Citations.]  [¶]  But that was nothing compared to what the evidence revealed about David, a six-foot-one, 185-pound husband who physically pushed five-foot-five, 130-pound Joannie around when he was angry.  [Citations.]  He admitted as much.  [Citation.]  David also admitted that he has spat on Joannie when he got mad.  [Citations.][] During another fight, he doused her with water.  [Citation.]  David acknowledges physically grabbing and moving Joannie 'three to five times.'  [Citation.]  This includes an incident when David violently tossed Joannie across a bed.  [Citation.]"[2]

---

[1] As is frequently the case in disputes between spouses, and for consistency with the briefing, we refer to the parties by their first names.

[2] We quote this portion from Joannie's brief, as it is an accurate recitation of some of the history set forth with supporting references, which is appropriate.  What is not appropriate is David's recitation of the claimed facts in his brief, which violates settled principles of appellate review by setting forth a version of facts favorable to him.  We said in *In re Marriage of Davenport* (2011) 194 Cal.App.4th 1507, 1531 that such conduct is "not to be condoned," going on to explain why:

"California Rules of Court, rule 8.204(a)(2)(C) provides that an appellant's opening brief shall '[p]rovide a summary of the significant facts . . . .' And the leading California appellate practice guide instructs about this:  'Before addressing the legal issues, your brief should accurately and fairly state the critical facts (including the

But one problem in the marriage was especially significant, and at the heart of the matter here—David's affair with E.D.. After Joannie learned of the affair, David admitted it, but told her it was "over and it was short lived." As Joannie put it, David swore "a million times that the affair was over, he was never having contact with" her again. As will be seen, that was false.

On October 20, 2014, David filed a petition for dissolution of marriage. Joannie originally refused to accept service. And when she eventually filed her response, she denied their issues were irreconcilable. Nevertheless, at some point, Joannie purchased another home in Atherton, on Fletcher Drive (Fletcher Drive home), though she did not move out of the Walsh Road home. To the contrary, Joannie kept essentially all her clothes in the Walsh Road home, in the closet she and David shared, and they often dressed there together in the mornings. And the family ate dinner at the Walsh Road home together almost every night.

Joannie's testimony included that she and David were getting along better than they had in a while. They would give each other gifts. They would buy take-out together or, even better, cook and "pal around" in the kitchen together: She'd "make the bagels. He'd make the bacon." In fact, in September 2015—some 11 months after David

evidence), free of bias; and likewise as to the applicable law. [¶] Misstatements, misrepresentations and/or material omissions of the relevant facts or law can instantly "undo" an otherwise effective brief, waiving issues and arguments; it will certainly cast doubt on your credibility, may draw sanctions [citation], and may well cause you to lose the case!' (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2010) ¶ 9:27, p. 9-8 (rev. # 1, 2010), italics omitted.) [Appellant's] brief does ignore such instruction.

"[David's] brief also ignores the precept that all evidence must be viewed most favorably to [Joannie] and in support of the [decision]. (*Nestle v. City of Santa Monica* (1972) 6 Cal.3d 920, 925–926; *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.) This precept is equally applicable here, where [the trial court] issued a statement of decision: 'Where statement of decision sets forth the factual and legal basis for the decision, any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision.' (*In re Marriage of Hoffmeister* (1987) 191 Cal.App.3d 351, 358.)"

petitioned for dissolution—on a visit to the Fletcher Drive home he told Joannie "he could envision himself living there if [they] reconciled."

Joannie's birthday was September 27, a day on which David was scheduled to travel to New York for a conference. On September 26, David went to the Fletcher Drive home and brought Joannie a birthday card with a note from him and some flowers.[3] In short, as the trial court would later find, at the very least David was sending mixed signals about whether the marriage was truly over.

And then came September 27.

**The Events on September 27, 2015**

As noted, September 27 was Joannie's birthday, and a celebration was planned for 11:00 a.m. As also noted, Joannie was still living "at least for part of the time" at the Walsh Road home, and most of her clothing was still there. So, Joannie went to the Walsh Road home to pick up clothes to wear to her party. She did not tell David she was coming because she thought he was out of town. When she arrived, she noticed a car in the driveway. She entered through the kitchen door, not announcing herself or asking if anyone was there. And she clomped around loudly.

Joannie soon heard music from a back room, and realized that David was there and having a massage, so she quieted down and made her way to the closet to avoid disturbing him. Standing in the closet, Joannie heard a buzz. She looked down and saw David's mobile phone signaling a text message, a message that indicated it was from a famous male singer. This was puzzling, so Joannie tapped the phone, to see on the screen the face of E.D. Joannie grabbed the phone and for some three minutes skimmed through

---

[3] David testified that the flowers were not from him, but from Joannie's friends and had been delivered to the Walsh Avenue home. David produced no documentary evidence of any such delivery, but even if his testimony were true, there is nothing to indicate Joannie was aware of this.

20 or so text messages that revealed, despite David's promises to her, that the affair was ongoing.[4]

Joannie was asked, "How did that make you feel? What were you feeling at that exact moment when you were reading those text messages?" She answered: "I was so heartbroken. You know, I had been suspicious, but I had hoped so much that it wasn't true. David had sworn a million times that the affair was over, he was never having contact with this woman again, that I was taking extra custody days for him left and right so that he could travel. He agreed that he wasn't going to be seeing her while he traveled. [¶] And so to discover that every—all yearlong he had been lying and that this had been going on constantly just set my mind racing." "10,000 questions" were racing through Joannie's mind. She had been trying hard to make things better, and "hoped so much" that his affair was truly over and that they were on a path to reconciling.[5]

This was the setting when David came into the closet—"burst" through, Joannie said—moving quickly toward her, and hovering less than a foot from Joannie's face. David snatched the phone out of Joannie's hand, saying, "What are you doing with my phone?"

"[R]eading text messages with [your] girlfriend," Joannie said. "What the fuck. . . . You're so much a liar," she added, and then slapped David twice and pushed him, scratching his neck. David said that if she did that again he would call 911.

David left the closet to pay the masseuse. Joannie met up with him again in the office, and reached over and grabbed the phone out of David's pocket. Joannie "tried to

---

[4] The parties disputed at trial whether David's phone required entry of a password to access his text messages. Joannie testified she did not enter any password. David testified to the contrary, and a neighbor friend of Joannie said she needed a password.

[5] As indicated by her answer quoted above, to help David out Joannie had been taking care of their special needs children extra days so that David could travel more easily for work. But it turned out the traveling was for his affair. And when David told her he was celebrating the Jewish holidays, he was actually with his mistress. Joannie realized that the numerous cards David had recently written to her—ones praising her as "wonderful" and "brilliant" and saying how lucky their children were to have her—were given while David was still secretly maintaining the affair.

leave the office with the cell phone," and "was trying to go to another part of the house," but David grabbed her, pried open her fingers, and yanked the phone out of her hands. Joannie then hit David. Asked why she acted as she did, Joannie testified, "I had just lost it," "I hadn't calmed down yet," "I was so overwhelmed and flooded, and all kinds of realizations kept hitting me . . . [and] each thing kept occurring to me."

After Joannie hit him, David called 911 on his phone but immediately hung up. Because of official policy, the Atherton police operator re-dialed the number, and David answered. The operator asked to speak to Joannie, who said, "I found out my husband is having an affair."[6] The operator asked if anyone was harmed, and Joannie said, "No, [David] hasn't done anything to me," "I was pushing him." And Joannie told the operator, "It's going to be fine. There's no problems or violence."

David, by contrast, told the operator that Joannie had "done things" to him, so the operator stayed on the line until the police arrived. The police interviewed both Joannie and David, and she admitted she slapped and pushed David in response to discovering his ongoing infidelity and deception. Ultimately the police made a "call" that Joannie was the primary aggressor and placed her under arrest.[7] The police asked David if he would like an emergency protective order, explaining to him what it was. David declined.

En route to jail, Joannie began to realize the situation, telling the arresting officer, "I didn't realize it was so severe. In the movies they slap their husbands." At trial, Joannie explained that she was not dismissing the magnitude of the situation: "I was kind of looking down and laughing and thinking what a shame that our culture teaches us to cheer when the wife finally slaps her husband."

The police processed Joannie at the county jail, after which she called David from there and asked if he would post bail and pick her up. He agreed. David drove there, alone, picked Joannie up, and let her sit next to him in the front seat as he drove. He was not worried for his safety. They drove to the Fletcher Drive home, where, along with the

---

[6] A tape of the conversation was entered at the hearing.

[7] Atherton police officer Don Dunphy testified that he told Joannie that they "unfortunately" had to arrest her.

children, David had a birthday party for Joannie, at which they blew out candles, ate cake, and opened presents. Afterward, David invited the whole family to come back with him to the Walsh Road home to spend the night.

The next day, September 28, Joannie phoned four close friends, two in the area and two in Washington, D.C.—her "closest confidants," the court noted—to tell them what happened: about David's ongoing affair, how she learned about it, and the awful birthday she had just gone through.

Later that same day, Joannie went to the Walsh Road home to pick up some supplies, thinking that David had now traveled to New York for his conference. She heard a noise in the guestroom and knocked on the door, and a voice said, "Come in." Joannie looked in, saw David holding his phone, and blurted out, "Sorry to interrupt your sexting . . . . How is your sex life?"[8] David replied, "Awesome." That hurt Joannie even more, and she closed the door and left.

Ultimately, the district attorney declined to prosecute Joannie, and all charges against her were dropped.

Joannie testified that the events of September 27 changed her life. She has fully relocated to the Fletcher Drive home, and the parties have moved forward with their divorce. Joannie accepts the separation, believes there is "definitely not" a chance of reconciliation, and recognizes that they "definitely don't belong together." Coming to this realization was "really freeing" for Joannie and allowed her to "turn a corner and discover my new life." And of particular significance to the issue here, there has not been one incident of any kind between them.

---

[8] Joannie testified this was an impulsive thing to say, but she was "very, very, very hurt."

**David Files a Request for a Restraining Order**

On September 30, three days after the incident and after talking to his divorce attorney,[9] David filed a request for a domestic violence restraining order against Joannie. It sought a five-year order and among other things demanded that Joannie vacate the Walsh Road home and stay 100 feet away from David and the children's school. The court granted a temporary domestic violence restraining order the next day.

On October 8, David and Joannie stipulated to a temporary timeshare arrangement for their children. They agreed to split custody evenly, but David insisted on continuing to pursue his request for a child custody evaluation. David also required a provision that specifically "reserves his right" to seek a custody modification "at any time" pursuant to Family Code section 3044, which creates "a rebuttable presumption that an award of sole or joint physical or legal custody of a child to a person who has perpetrated domestic violence is detrimental to the best interest of the child."

On November 10, the trial court held a hearing on David's request that Joannie undergo a child custody evaluation, following which it denied the request without prejudice to reviewing its ruling at the upcoming hearing on January 4, 2016. At the January 4, 2016 hearing, the trial court again denied David's request.

Meanwhile, from all indications in the record, the parties engaged in extensive discovery, including depositions, not just those of David and Joannie, but also of various neighbors and friends.

**The Trial**

Trial on David's petition took place over two days, on February 26 and March 4, 2016. Seven witnesses testified: David, Joannie, two Atherton police officers, the 911 operator, a neighbor, and a person who worked for a friend of David. The attorneys then presented oral argument. The trial court then announced its statement of decision, a

_____

[9] The Family Code provides that restraining orders can play a role in connection with child custody and spousal support issues. (See Fam. Code, §§ 3044, 4320, subd. (i).) The request came against the backdrop of a child custody evaluation David had been trying to compel since January 2015.

statement that went on for over four pages of explanation, explanation that was thoughtful indeed.  It included the following:

"The Court also considered the facts—some other facts around that incident.  First of all, that no criminal case was filed; second of all, that Mr. Fischer did not request the Emergency Protective Order at the time of the alleged incident.  The Court also considered the fact that Mr. Fischer bailed Ms. Fischer out of custody, that he went to the Fletcher home, celebrated her birthday with her and with the children, and then spent that night with her and the children at . . . Walsh Street.

"This case strikes the Court as being, quite frankly, a singular incident, although it's clear that this relationship had been perhaps unhealthy for quite some time, and there was some inappropriate, perhaps immature, behavior going both ways.

"Ultimately the Court has decided the following:  The request for the restraining order is denied.  The Court finds that Ms. Fischer did not commit an act of abuse as defined under the Family Code 6203 which specifically indicates abuse being the intentional or recklessly causing or attempting to cause bodily injury.  Under the facts that were, for the most part, uncontroverted, Mr. Fischer was having a long-term affair.  It's the Court's finding that there were a lot of mixed signals that were being given.  It's clear that Ms. Fischer, by her evading being served with the petition for divorce, even though she was living in the same house, the fact that she disagreed that there were irreconcilable differences, makes it clear to this Court that at least of the time of the filing, up until the time that she discovered that the affair was still ongoing did not want to divorce.

"The Court finds the fact that she was still, at least for part of the time, living in the Walsh Street home with Mr. Fischer further evidenced that there were conflicting messages about whether or not this marriage was going to reconcile, whether or not it was specifically communicated or not by Mr. Fischer.  The Court finds it very instructive, and I believe Ms. Fischer's testimony that she thought the affair to be over and that, although she knew about it, she certainly had a different understanding of its duration

9

which explains what happened in the closet when she discovered that her understanding was patently wrong.

"The Court does not find that what has been characterized as the dissemination of the emails to be harassment, the behavior of an individual who has just found out that her spouse is having an affair that, one, that spouse thought was over, and, two, was far more reaching than originally understood, it is certainly understandable to then talk to some of your closest confidants about the source of how you discovered that affair.

"The Court does not find talking with you're [*sic*] close friends about those texts and, quite frankly, the specifics of what you remember that they said, which goes to the heart of the betrayal to be assaultive or harassment behavior towards the petitioner in this case.

"The Court does not find that the denial of the restraining order will jeopardize the petitioner's safety pursuant to Family Code Section [6]340(a) for the following reasons: Visitation has already been at 50/50. There was significant testimony that the parties granted were never fully alone together but have been trying as best they can to co-parent these two boys, and so, therefore, the Court feels that the denial of a restraining order is not going to impact the safety or welfare of the children.

"Furthermore, Ms. Fischer testified, and the Court finds that testimony credible, that, first of all, she clearly is living in a different home, the Fletcher Street address, and that she at this point has not only accepted that the marriage is over but is at a point where that is freeing.

"So, again, in regards to petitioner's safety, the Court finds that this incident that occurred on September 27th, 2015, was a singular incident and was due wholly to what had been the long-term—the long-time breakdown of the marriage that the respondent didn't want to end but ultimately was faced with when she discovered the text messages from the woman who is now the girlfriend.

10

"So that is the Court's ruling.  Whatever temporary orders were in place have now expired and they are terminated."[10]

On May 27, David filed notice of appeal from the court's statement of decision. No order after hearing for the domestic violence proceeding has ever been filed.

On June 13, David filed a petition for a writ of mandate (no. A148551), which raised similar arguments to those he raises in this appeal.  We denied it.

## DISCUSSION

### Standard of Review

"Generally, a trial court has broad discretion in determining whether to grant a petition for a restraining order under" the Domestic Violence Prevention Act (DVPA or the Act).  (*In re Marriage of Fregoso and Hernandez* (2016) 5 Cal.App.5th 698, 702.) Indeed, in the context of domestic violence restraining orders, this broad discretion is expressly provided by Family Code section 6320,[11] which states that trial courts "may" issue restraining orders when the statutory criteria are met.  (See *Woodbury v. Brown-Dempsey* (2003) 108 Cal.App.4th 421, 433 ["the word 'may' connotes a discretionary or permissive act"].)  Moreover, section 6301, subdivision (c), vests the trial court with authority to consider "the totality of the circumstances" in its exercise of discretion to grant or deny a domestic violence restraining order.

We review such discretionary ruling to determine if that discretion was abused, which review is based on well-settled principles, including these from the Supreme Court:  Discretion is "abused" only when, in its exercise, the trial court "exceeds the bounds of reason, all of the circumstances before it being considered."  (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 566; *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773 ["A ruling that constitutes an abuse of discretion has been described as one that is 'so irrational or arbitrary that no reasonable person could agree with it' "].)

---

[10] A transcript of the court's comments was attached to the court's statement of decision filed April 13.

[11] All statutory references are to the Family Code.

We discussed the concept of abuse of discretion at length in *People v. Jacobs* (2007) 156 Cal.App.4th 728, 736–738.  We began as follows:

"Various definitions and principles describing the abuse of discretion standard of review have been stated and repeated in numerous cases, such as in *Blank v. Kirwan* (1985) 39 Cal.3d 311, 331, that we will set aside a trial court ruling only upon a showing of ' " 'a clear case of abuse' " ' and ' " 'a miscarriage of justice.' " '  As to what is required to show such abuse, it has been said that a trial court abuses its discretion only when its ruling ' " 'fall[s] "outside the bounds of reason." ' " [Citation.]' (*People v. Benavides* (2005) 35 Cal.4th 69, 88 [citations.].)  More colorfully, it has been said that discretion is abused only when the trial court's ruling is arbitrary, whimsical, or capricious.  (*People v. Linkenauger* (1995) 32 Cal.App.4th 1603, 1614; *People v. Branch* (2001) 91 Cal.App.4th 274, 282; see *People v. Giminez* (1975) 14 Cal.3d 68, 72 [' "capricious disposition or whimsical thinking" '].)" (*People v. Jacobs*, *supra,* 156 Cal.App.4th at p. 736.)

We went on to note other possible descriptions, quoting from *City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1297, that " 'Very little of general significance can be said about discretion.  " 'The discretion of a trial judge is not a whimsical, uncontrolled power, but a legal discretion, which is subject to the limitations of legal principles governing the subject of its action, and to reversal on appeal where no reasonable basis for the action is shown.  [Citation.]' " (*Westside Community for Independent Living, Inc. v. Obledo* (198[3]) 33 Cal.3d 348, 355], citing to 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 244.)  The scope of discretion always resides in the particular law being applied, i.e., in the "legal principles governing the subject of [the] action . . . ." ' " (*People v. Jacobs, supra,* 156 Cal.App.4th at p. 737.)

And we concluded our discussion with this:  "All this is well described in Witkin where, likewise citing the still vital *Bailey v. Taaffe* [(1866)] 29 Cal. 422, 424, the author distills the principle as follows:  'Limits of Legal Discretion.  [¶]  The discretion of a trial judge is not a whimsical, uncontrolled power, but a legal discretion, which is subject to the limitations of legal principles governing the subject of its action, and to reversal on

12

appeal where no reasonable basis for the action is shown.  (See 5 Am.Jur.2d, Appellate Review § 695.) …' (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 358, pp. 406–407.)"  (*People v. Jacobs, supra,* 156 Cal.App.4th at p. 738.)

Applying these rules in a domestic violence protective order context, *Fregoso* held that the court will affirm unless " ' "the trial court exceeded the bounds of reason." ' " (*Fregoso, supra,* 5 Cal.App.5th at p. 702, citing *Gonzalez v. Munoz* (2007) 156 Cal.App.4th 413, 420.)  And it went on, " ' "When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court," ' " but instead must "accept as true all evidence tending to establish the correctness of the trial court's findings, resolving every conflict in the evidence in favor of the judgment."  (*Ibid.*, citing *Burquet v. Brumbaugh* (2014) 223 Cal.App.4th 1140, 1143.)

Faced with these principles, David has a daunting challenge—a challenge he has not met.  Indeed, we could perhaps end this opinion by referring to David's acknowledgment in his reply brief where, replying to Joannie's assertion that his position provides for "strict liability," David says this:  "David never said the DVPA provides for strict liability, as Joannie repeatedly claims. [Citations.]  [¶]  The DVPA gives courts discretion to deny a protective order even when abuse has been proven."

We nevertheless analyze the record here, to conclude that the trial court did not abuse its discretion, not in light of the applicable law—and not in light of the trial court's considered decision.

David's petition was brought pursuant to the Act, which as amended in 2014 provides that its purpose is "to prevent acts of domestic violence, abuse, and sexual abuse and to provide for a separation of the persons involved in the domestic violence for a period sufficient to enable these persons to seek a resolution of the cause of the violence." (§ 6220.)[12]

---

[12] Joannie's unopposed request for judicial notice is granted.

Section 6203, subdivision (a), provides: "For purposes of this act, 'abuse' means any of the following: [¶] (1) To intentionally or recklessly cause or attempt to cause bodily injury. [¶] (2) Sexual assault. [¶] (3) To place a person in reasonable apprehension of imminent serious bodily injury to that person or to another. [¶] (4) To engage in any behavior that has been or could be enjoined pursuant to Section 6320."

And the referenced section 6320 provides in subdivision (a) that: "The court may issue an ex parte order enjoining a party from molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, credibly impersonating as described in Section 528.5 of the Penal Code, falsely personating as described in Section 529 of the Penal Code, harassing, telephoning, including, but not limited to, making annoying telephone calls as described in Section 653m of the Penal Code, destroying personal property, contacting, either directly or indirectly, by mail or otherwise, coming within a specified distance of, or disturbing the peace of the other party, and, in the discretion of the court, on a showing of good cause, of other named family or household members."

**The Trial Court Did Not Abuse Its Discretion**

As quoted above, the trial court made four essential rulings in its statement of decision. First, that Joannie did not commit an act of abuse as defined in section 6203. Second, that Joannie's discussion with her four confidants was not unlawful harassment. Third, that denial of David's request will not jeopardize his safety within the meaning of section 6340, subdivision (a). And fourth, that denial of David's request will not impact the safety or welfare of the children. Those rulings are all supported by the record. There was no abuse of discretion.

The trial court's exercise of its discretion is measured against its "consisten[cy] with the statute's intended purpose." (*People v. Rodriguez* (2016) 1 Cal.5th 676, 685.) And as quoted above, there are two explicit statutory purposes enshrined directly in the Act, both referencing the future. In short, while past acts of abuse "may" form an adequate evidentiary basis on which to issue a domestic violence restraining order, the purpose of such an order is still entirely prospective: to "prevent acts of domestic

14

violence [and] abuse" in the future and to "provide for a separation of the persons involved . . . ." (§ 6220.) David has admitted neither of these purposes applies here.

David asserts that the trial court abused its discretion, apparently on at least three separate bases, the index to his argument including the following: "Joannie committed abuse against David on September 27"; "Joannie's reading and disclosure of David's private text messages was also abuse"; and "Joannie's prior destruction of property was also abuse."

The heart of David's first argument is, in his words, this: "Slapping and pushing a spouse are acts of abuse as a matter of law. (See, §§ 6203, subd. (a) & 6320, subd. (a).) The court's finding that Joannie's conduct was not 'abuse' is reviewed *de novo* based on the uncontroverted evidence that Joannie slapped and pushed David several times, read and disclosed his text messages, and destroyed property in his presence. An abuse of discretion occurred because the court did not adhere to the statutory definition. [¶] The court misunderstood the purposes of the DVPA by focusing on Joannie's reasons for being angry at David, instead of looking for 'reasonable proof of a past act or acts of abuse.' (§ 6300.) The question was not *why* she slapped and pushed David, but *if* she did any of those things. The denial of the DVRO was based on an erroneous understanding of the law and consideration of improper legal criteria, so it was an abuse of discretion." We disagree.

David acknowledges that in order to establish abuse, section 6203, subdivision (a)(1), requires a finding that Joannie "intentionally or recklessly cause[d] . . . bodily injury." He argues, however, that because section 6203, subdivision (a)(4), incorporates section 6320, and section 6320 includes "striking" among the prohibited acts without specifying intent or other mens rea, Joannie's slap of David was a "strike" and thus "abuse" as a matter of law, irrespective of any mens rea requirement.

David's analysis of section 6203 is implausible on its face because it entirely reads out of the statute subdivision (a)(1). In other words, as David would have it, a party who causes or attempts to cause "bodily injury" must do so "intentionally or recklessly." But a person who strikes—or, apparently, "telephones" or "contacts"—another need not.

Such a reading is, frankly, incredible, and would rewrite a statute in which the Legislature expressly included a mental state requirement into one that operates by strict liability.

"The objective of statutory interpretation is to ascertain and effectuate legislative intent. To accomplish that objective, courts must look first to the words of the statute, giving effect to their plain meaning. If those words are clear, we may not alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history. [Citation.] Whenever possible, we must give effect to every word in a statute and avoid a construction making a statutory term surplusage or meaningless." (*In re Jerry R.* (1994) 29 Cal.App.4th 1432, 1437.)

"Intentionally" or "recklessly" is what is required. And both terms require a conscious, deliberate decision. (See *Marich v. MGM/UA Telecommunications, Inc.* (2003) 113 Cal.App.4th 415, 421–422 [defining "intentional" in several ways, all of which require a volitional act]; *Towns v. Davidson* (2007) 147 Cal.App.4th 461, 470 [recklessness requires " ' "deliberate disregard" of the "high degree of probability" that an injury will occur' " and is " 'a "conscious choice of a course of action . . . with knowledge of the serious danger to others involved in it" ' "].)

Joannie had been trying hard to reconcile and testified to several events that would lead her to think that it was succeeding, events that, in the words of the trial court, gave off "conflicting messages" or "mixed signals." And after seeing E.D.'s picture on the phone, Joannie said everything was "a blur"; she was "overwhelmed and flooded" and she "lost it." Given the court's credibility finding, this evidence is sufficient to conclude that Joannie was so emotionally shocked by the events that she was not thinking or acting with presence of mind, but rather instinctively in the heat of the moment—without the requisite level of consciousness to constitute "intentional" or "reckless" behavior.

In a brief argument, David states that Joannie's "reading and disclosure of David's private text messages was also abuse," that it was "disturbing the peace under the" Act. The argument is based on Joannie's admitted reading through some 20 text messages, and

16

her talking to her four close friends about them.  The trial court found this was not harassment.  Properly so.

David's brief argument cites, with little discussion, two cases:  *In re Marriage of Nadkarni* (2009) 173 Cal.App.4th 1483 and *In re Marriage of Evilsizor & Sweeney* (2015) 237 Cal.App.4th 1416.  Neither case is remotely applicable here.  The ex-husband in *Nadkarni* secretly accessed his ex-wife's private email account over the course of several months, and then used the emails he discovered to ruin her business and her personal relationships.  He also left semi-threatening messages with her friends saying he knew her schedule and where she would be.  (*Nadkarni, supra,* 173 Cal.App.4th at pp. 1488–1493.)  That is a far cry from what Joannie did here.

*Evilsizor & Sweeney* is an even farther cry.  There, the husband became convinced his wife gave birth to a child that was not his.  He then used special software to surreptitiously access her phone, from which he downloaded "tens of thousands" of text messages and notes, including her attorney-client communications and personal diary.  He also accessed her Facebook account and redirected her messages to his own email account.  (*Evilsizor & Sweeney, supra,* 237 Cal.App.4th at pp. 1420–1421.)  Then, after spending more than "20 to 30 hours" reviewing the files he stole, he attached the most salacious of those emails to his public filings in the divorce proceedings, and threatened his wife that he would reveal her secret messages to her friends.  He also went to her parents' home and told her father some of her most intimate details, which he gleaned from his access to her electronic accounts.  And when finally ordered by the trial court to turn the stolen files over to his wife, the husband produced "11 to 12 gigabytes of data," enough to fill more than 200,000 printed pages.  (*Id.* at p. 1421.)  That supported— perhaps compelled—the wife's request for a domestic violence restraining order.  Joannie's one-time conversation with her four close friends does not.

Finally, David argues that Joannie's "prior destruction of property was also abuse."  This argument is all of one paragraph and is based on section 6320, subdivision (a), that includes in the long list "destroying personal property."  David cites no case in support of this argument, and we easily reject it, especially because on the two

17

occasions Joannie "admitted" doing any damage to property she was alone and apparently venting some anger. There is no evidence this posed any danger to David.

David also makes two brief arguments that the court relied on two claimed "improper factors": (1) whether the restraining order would affect Joannie's right to spousal support, and (2) the lack of criminal prosecution or emergency protective order. Again, we disagree.

As to the spousal support argument, David misstates the record. That is, David cites to the reporter's transcript, but that was a colloquy between David's attorney and the court, colloquy in which the attorney corrected any possible misunderstanding. Most significantly, spousal support was not mentioned, much less relied on, in the statement of decision.

David's claim as to the lack of criminal prosecution and lack of an emergency protective order fares no better. To begin with, David again misstates the record, his argument asserting that "the court's comment that no criminal charges were filed is at odds with the evidence because Joannie's attorney told the court [during an October 21, 2015 pretrial hearing] a criminal case had been filed against Joannie [citation], and the record contains no mention of the criminal case being dismissed." To the contrary, the record does contain such evidence, in at least two places: the first is in Joannie's March 10, 2016 declaration, where she states: "The District Attorney . . . elected not to charge me with any crime"; the second is at trial, where David's attorney acknowledged that "there's no criminal finding . . . ." In any event, the trial court did not abuse its discretion by considering the evidence, as it went not only to David's credibility, but most expressly to the genuineness of his claim he fears Joannie.

David makes a final argument that "[a] reasonable person would entertain doubt whether the ruling was the product of gender bias." The argument is not well developed, but one impression that can be taken from it, the impression taken by Joannie, is that the trial judge was a woman who ruled against him because of gender bias. David's reply denies that this was the import of the argument, so we will let it go at that.

18

To the extent David argues any actual bias, any such claim is belied by the many rulings the trial court issued in his favor throughout the litigation. The trial court rejected Joannie's arguments that her statements to the police were protected by the Fifth Amendment; agreed with David's arguments that statements made during the mediation process were confidential; permitted David's attorney to treat Joannie as an adverse witness before she even took the stand; and made numerous midtrial evidentiary rulings in David's favor. David demonstrates no bias.

## DISPOSITION

The denial of the restraining order is affirmed. Joannie shall recover her costs on appeal.

_____
Richman, Acting P.J.

We concur:

_____
Stewart, J.

_____
Miller, J.

Filed 4/20/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| DAVID FISCHER,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>JOANNIE FISCHER,<br><br>        Defendant and Respondent. | A148482<br><br>(San Mateo County<br>Super. Ct. No. FAM0127015 )<br><br>**ORDER CERTIFYING OPINION<br>FOR PUBLICATION** |

**BY THE COURT:**

The opinion in the above-entitled matter filed on March 23, 2018, was not certified for publication in the Official Reports. For good cause, the request for publication is granted.

Pursuant to California Rules of Court, rules 8.1105 and 8.1120, the opinion in the above-entitled matter is ordered certified for publication in the Official Reports. Listing of counsel for the Official Reports is attached hereto.

Dated: _____          _____
                                                                           Acting P.J.

1

Trial Court:   San Mateo County Superior Court

Trial Judge:   Hon. Rachel Holt

Counsel:

Walzer Melcher, Christopher C. Melcher, Edward M. Lyman for Plaintiff and Appellant.

California Appellate Law Group, Robert A. Roth, Ben Feuer for Defendant and Respondent.