Filed 3/3/23  In re Clare M. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re Clare M. et al., Persons Coming Under the Juvenile Court Law. | |
| MARIN COUNTY HEALTH AND HUMAN SERVICES,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>C.E.,<br><br>        Defendant and Appellant. | A165575<br><br>(Marin County<br>Super. Ct. Nos. JV27036A,<br>JV27086A) |

After finding that appellant C.E. (mother) had failed to demonstrate the applicability of the beneficial parental relationship exception under Welfare and Institutions Code[1] section 366.26, subdivision (c)(1)(B)(i) with respect to her children Clare M. and E.E., the juvenile court terminated her parental rights.  Mother argues that the juvenile court erred in failing to find the exception applicable under *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*), that the court erred in denying her motion for a bonding study, and that reversal is required by the failure of the Marin County Health and Human Services Department (department) to provide her appellate counsel with

---

[1] Further statutory references are to the Welfare and Institutions Code.

1

certain of the department's delivered service logs with respect to the children. We affirm.

## BACKGROUND

On December 3, 2020, the department filed a juvenile dependency petition pursuant to section 300, subdivision (b)(1) with respect to then three-year-old C.M. and six-year old Clare M., alleging that the children were at substantial risk of serious physical harm or illness due to mother's alcohol abuse and failure to protect them from violent and aggressive behavior.[2] According to the petition, on December 1, 2020, law enforcement had conducted a welfare check at a boat where mother was living with the children, finding her "highly intoxicated from alcohol" and noting that she was "aggressive, uncooperative, refused to provide identifying information for her children, and was unable and unwilling to make provisions for her children's' care."

A detention hearing took place over Zoom on December 15, at which hearing the juvenile court continued the children's detention and set a contested jurisdiction hearing for January 5, 2021.

At the jurisdiction hearing on January 5, the juvenile court sustained the allegations of the petition and set a disposition hearing for January 19.

On January 21, the department filed disposition reports recommending that the court declare the children dependents of the court, order reunification services for mother, and order that the parties adopt the department's proposed case plan. The report identified the main problem

---

[2] The petition itself does not appear to be part of the record on appeal. On our own motion, in order to provide the factual and procedural background, we take judicial notice of the record in a related appeal, A162576, which contains the petition. (See Evid. Code, §§ 459, subd. (a); 452, subd. (d).)

requiring intervention as mother's "chronic alcohol use," and noted that mother's refusal to communicate with the social worker regarding her case made further assessment difficult. However, the report also noted that mother's "bizarre statements to the Undersigned and other Department social workers about taking legal action in federal court and refusing to accept the validity of the Marin County Juvenile Court's proceedings also suggests [mother] may have an underlying mental health condition." The department's case plan included that mother complete a psychological evaluation and a substance abuse program.

Contested disposition hearings took place on February 11. The juvenile court found, by clear and convincing evidence, that placement of the children with mother would be detrimental to their safety, protection, physical, or emotional well-being due to mother's "long-standing, very significant alcohol problem" and "issues with some substandard living conditions, lack of supervision, lack of medical care and lack of addressing educational needs." The juvenile court ordered supervised visitation with Clare M. for one hour per week, and visitation with C.M. for one per hour per week, plus one 30-minute video call per week. A six-month status review hearing was set for August 10.[3]

In March, mother gave birth to E.E. in a hotel room. On March 30, the juvenile court issued a protective custody warrant for E.E. due to mother's substance abuse and unaddressed mental health issues.

---

[3] On April 9, 2021, mother, C.M.'s father, and Clare M.'s father filed a joint notice of appeal of the "Child Welfare Services Case Plan" dated February 2, 2021. On December 30, 2021, we affirmed. (*In re Clare M.* (Dec. 30, 2021, A162576) [nonpub. opn.].)

A detention hearing for the newborn E.E. took place on April 13. According to the detention report, mother's whereabouts were unknown, and she had refused to produce E.E. in response to the protective custody warrant. The juvenile court ordered that E.E., once located, be detained from mother's care, and issued a warrant for mother's arrest under section 339. The juvenile court set a combined jurisdiction and disposition hearing for May 18.

Mother was arrested in Alturas, California on April 13 and E.E. was taken into protective custody. At a contested hearing on July 1, the juvenile court sustained the allegations of the petition and ordered that E.E. remain in out-of-home care. A six-month status review hearing for E.E. was set for December 17.

On or around October 5, the juvenile court terminated mother's reunification services with respect to Clare M. and set a section 366.26 hearing for February 1, 2022.[4]

On November 19, in advance of the six-month status review hearing set for December 17 in E.E.'s case, the department filed a status report recommending that mother's reunification services with respect to E.E. be terminated and requesting that the juvenile set a section 366.26 hearing to determine a permanent plan for E.E. The report indicated that mother "continues to state that she does not need inpatient substance abuse treatment and feels that her alcohol use is no longer a problem." Although mother "seems to agree with the psychological evaluation that she has extensive trauma that requires treatment" and "has named multiple

---

[4] According to the department's brief, mother's reunification services were also terminated as to C.M., whose dependency was later dismissed after he reunified with his father. C.M. is not at issue in this appeal.

4

therapists," she "either will not sign releases and/or is not following up with them." The social worker "remain[ed] extremely concerned about [mother]'s mental health, substance abuse, and ability to trust and follow the recommendations of professionals."

At the six-month status review hearing on December 17, mother requested a contested hearing, which was set for January 13, 2022.

At the contested hearing on January 13, the juvenile court terminated mother's reunification services with respect to E.E. and set a section 366.26 hearing for May 10, 2022. Meanwhile, the section 366.26 hearing as to Clare M. was continued several times.

**Mother's Motion for a Bonding Study**

At a hearing on March 22, mother's counsel indicated that she would be filing a motion for a bonding study. The court set a briefing schedule and a hearing on the motion for April 19.

On April 19, the juvenile court heard argument on mother's motion for a bonding study, and at the conclusion of that hearing, ruled as follows:

"THE COURT: So the matter, as you know, comes before the Court on a request for the bonding study. As noted by minor's counsel, I do understand that request in the post-[*Caden C.*] world, and I understand why Ms. Bazar [mother's counsel] has made it now, which is really her first opportunity to do so.

"However, I do note that mother declined representation by court-appointed attorneys, retained her own attorney, and that was a decision that was made.

"So the gist—let me start here: There is no requirement in statutory or case law that a court must secure a bonding study as a condition precedent to a termination order.

5

"The authority for ordering the study would come by way of Evidence Code Section 730, which provides, in relevant part: 'Where it appears to the Court that expert evidence is, or may be, required, the Court may appoint one or more experts to investigate, to render a report as may be ordered by the Court, and to testify as to an expert at trial of the action relative to the fact or matter as to which the expert evidence is, or may be, triggered.'

"I am aware that the recent case of [*Caden C.*] recognizes, and here's the quote, 'Often expert psychologists who have observed the child and parent and,' quote, 'can synthesize others' observations will be an important source of information.'

"I emphasize the two words, 'Often,' and, 'Can.' There's no mandate. So my inquiry here is whether the findings of the bonding study are necessary and important.

"First, I want to address the issue of timing. Although, the preservation of a minor's family is one of the goals of the dependency laws, it is of critical importance only at the point in the proceedings when the court removes a dependent child from parental custody.

"Family preservation ceases to be an overriding concern if a dependent child can't be safely returned to parental custody and the Court terminates reunification services.

"Then the focus shifts from the parents' interest in reunification to the child's interest in permanency and stability.

"So by the time of the permanency planning hearing, a parent's right to develop further evidence regarding the bonding with the child is approaching the vanishing point. That's [*In re*] *Richard C.* (1998) [68] Cal.App.4[t]h 1191, and [*In re*] *Lorenzo C.* [(1997)] 54 Cal.App.4[t]h [1330].

6

"The issue of parental bond is, therefore, important, but is not a primary issue under the circumstances. It is unlikely that a bonding study would have been—excuse me—the purpose of ordering a bonding study is to have an expert determine and then testify to the attachment, if any, between the parent and the child.

"And the mother will have an opportunity to present that evidence during the hearing. But this court will not delay the proceedings any further nor submit the minor to a study.

"A bonding study after termination of reunification services frequently requires delays in permanency planning.

"Similar requests to acquire additional evidence in support of parents' claim could be asserted in nearly every dependency proceeding where the parent is maintaining some contact with the child.

"The legislature did not contemplate such last-minute efforts to put off permanent placement. While it is not beyond the juvenile court's discretion to appoint a bonding study under compelling circumstances, the denial of a request for such a study is fully consistent with the scheme of the dependency statutes and due process, again, citing *Richard C.*

"I believe that Clare deserves to have the matter resolved and to obtain stability one way or the [other], and whatever that stability looks like.

"Further, I don't believe it is likely that a bonding study would be useful to the juvenile court in this particular case.

"There have been extensive social studies. There have been numerous contested hearings. In this case, I have presided over the case from the beginning so I have a very in-depth knowledge of the case.

"And, here, an expert's snapshot of interactions between mother and Clare, I don't believe would be that helpful.

"I have had an opportunity to observe and read and involve myself in this case over the last 17 months, and I believe that I have the necessary information to proceed without the need for a bonding study.

"So, Ms. Bazar, the request for the bonding study is denied."

**The Section 366.26 Hearings**

Section 366.26 hearings with respect to Clare and E.E. were ultimately held together on May 11, 2022.

By way of brief background leading to them, on January 28, 2022, the department filed a section 366.26 report in Clare's case in anticipation of the section 366.26 hearing then set for February 1, 2022. The report recommended that the court terminate mother's parental rights and order adoption as the permanent plan. The report summarized the frequency of mother's visitation with Clare and E.E. as follows:

"At the Detention Hearing on December 15, 2020, the Court ordered visits as once a week for an hour, supervised. However, because Clare's brother had a second 30-minute virtual visit per week, this was extended to include Clare. . . . "

The report indicated that mother had attended nine visits between December 17 and February 15, with six virtual and one by telephone. She had missed three visits. The report continued:

"[Mother] attended nine out of 12 possible visits during this reporting period, which is approximately 75%. It should be noted that [mother] left the state for a gem show and that she missed one potential in person visit on January 29, 2021, but did attend the visit virtually. During the first visit on December 17, 2020, [mother] let the children know she loved them and missed them. She made age appropriate conversation and when Clare told her mother she wanted to come home, [mother] did a good job of reassuring

8

her that she is okay and being well cared for. The second visit, on January 6, 2021, was very similar in that the children and [mother] expressed that they loved each other, shared hugs, and engaged in positive, age-appropriate conversation.

"However, from this point onward, Clare became less engaged in visits, and chose to shorten the length of her visits to play. On January 8, 2021, the visit only last 15 minutes as Clare and her brother [C.M.] asked to end the visit early so they could play. On January 15, 2021, the children played with each other while [mother] watched them and engaged with them. On January 20, 2021, the visit was a phone [visit] due to [mother] having technical issues. This visit lasted one minute, as Clare got on the phone and said, 'I love you' but expressed that she did not wish to talk. During the visit on January 22, 2021, Clare lasted ten minutes and the said she preferred to go play. Again, on February 3, 2021, Clare asked to leave after saying hello. On February 5, 2021, the visit did last the entire 30 minutes."

From disposition on February 11 through the six-month review on October 5, the report indicated that mother had attended 28 visits by date, 10 virtual and one by phone. She had missed 13 visits. The report went on:

"During this reporting period, [mother] attended 28 out of 54 potential visits (not including the visit the Resource Parent cancelled), which is approximately 55%. It should be noted that this includes 14 potential visits that would have been offered in May 2021 and June 2021 had [mother] continued to visit. However, on April 30, 2021, [mother] was pulled from the visit calendar as a result of her having missed four consecutive visits. It should also be noted that on, or about June 30, 2021, in person visits were increased from one hour to one and a half hours in lieu of a second, 30-minute virtual visit. [¶] . . . [¶]

9

"Often during virtual visits, Clare would come in and out of the view of the screen and would often ask to end the visit early, or not participate in the visit because she preferred to go play or watch a movie. Clare would frequently tell her mother that she loved her, but she wanted to 'go play.' Visits were sometimes decreased from 30 minutes to 15 minutes. On June 30, 2021, [mother] requested to end the visit early when Clare's baby brother, [E.E.], was inconsolable. It was also reported by the Resource Parent that Clare had stated at one point that she did not wish to visit."

At the six-month review hearing on October 5, 2021, the court ordered supervised visits twice a month, for a total of two hours per month. For the period from the six-month review on October 5 through the section 366.26 selection and implementation hearing on February 1, 2022, mother had attended six visits, and missed two.

On April 14, the department filed a first addendum to the section 366.26 report. The report indicated that "[s]ince the original 366.26 report was written, [mother] has had the opportunity to participate in four additional visits. The first visit was scheduled for February 3, 2022. [Mother] called to confirm her visit in the morning, but later called to cancel, stating it interfered with her mother's wake. The Department offered a courtesy make up visit which was scheduled for February 10, 2022. [Mother] failed to call in for this visit. [Mother] has never communicated that she had technical or communication issues with her phone preventing her from calling in. Recently she, in fact reported, she had not forgotten to call in, but that she was busy with other calls and lost track of the time—this resulted in her failing to call and confirm that visit. The next two visits occurred on February 17, 2022, and March 10, 2022. [Mother] had a fourth visit scheduled for March 17, 2022.

10

"In summary, [mother] attended eight out of 12 (13 if you count the makeup visit) potential visits, which is approximately 66% attendance for all visits during this reporting period."

The addendum went on:

"As mentioned above, during the first few months of the case, from detention to disposition, [mother]'s visitation attendance was 75%, or 9 out of 12 possible visits. During the Family Reunification portion of the case, [mother] attended 28 out of 54 potential visits, or 55%. It should be noted that some of these missed visits with Clare came during the period [mother] chose to evade the emergency protective warrant for [E.E.]. In other words, [mother] made a very clear choice to abandon her visits with Clare with apparent disregard of the immediate emotional impact this could have on Clare. This conduct appears to be consistent with prior reports from Clare that [mother] would leave Clare and her siblings for long periods.

"Even after Clare's half-sibling [E.E.] came into custody after her arrest, [mother] made limited efforts to visit all three children despite efforts by the department. These efforts were detailed in full in the status review report prepared for August 10, 2021. During this period [mother] sent numerous emails and text messages to the department regarding her refusal, at the time, to comply with the department's Covid-19 guidelines for visits. For example, in one email on May 18, 2021, [mother] wrote: 'I'm sorry. I will not be subjecting myself to the "rules" of your pirate [*sic*] organization limited viewing of my children. Please don't contact me anymore . . .'" . . . .

"From the termination of [mother]'s reunification services through to the writing of this report, [mother]'s participation in visits has been approximately 66% (7 out of 12 visits).

"Thus, in sum, [mother] has taken advantage of just 44 of the 78 scheduled visits with Clare from the beginning of the case. This essentially translates to [mother] taking advantage of approximately 56% of the opportunities provided to her to maintain her connection with Clare."

As noted, the section 366.26 hearings for Clare and E.E. took place on May 11, 2022. Mother was not present. At the conclusion of the hearing, with respect to Clare, the juvenile court ruled as follows:

"THE COURT: Okay.

"Back on the record in the matter of Clare [M.]

"I have heard the evidence and the arguments presented at this Selection & Implementation Hearing.

"The purpose of a Selection & Implementation Hearing is to select the most appropriate path for this child. The first issue of course is is there clear and convincing evidence that Clare is likely to be adopted? Yes, there is. Clare is developmentally and physically healthy. She is described by her teachers as being a joy, she has friends, so by all indications it shows that she is generally adoptable.

"She has also been living in a resource home for well over a year, and I understand that resource parent wishes to provide a permanent home through adoption for Clare, so she is also specifically adoptable.

"Moving past that, we move to any exceptions to that general rule, because once that is met the Court shall terminate parental rights unless an exception is met.

"The exception that has been raised today is the beneficial relationship exception, and I'm going to walk through that a bit. Much as Ms. Frey [counsel for the department] outlined for us, it's been the subject of many cases over the last period of time, and it is a subtly shifting target. I want to

12

lean on some language from the *Caden C.* case that the Court must sift through complicated facts, consider practical realities, and envision a child's future under contingent conditions, so I will take on that task to the best of my abilities.

"In order to establish a beneficial relationship, the burden shifts from the Department to the parent, and there are three major elements that the parents must prove.

"The first is that the parents have regular and continuous visitation, and they continue to develop a significant positive, emotional attachment from the child to the parent.

"I cannot say that mother has engaged in regular visitation. I know that the percentage is 56 percent, that is a number. Part of that was because mother absconded from the area for a significant period of time with another child. Part of it is that mother, I think to a great extent due to some oppositional thinking on her part, declined to comply with COVID requirements which this Court and the Department had imposed for Clare's safety, and part of it I think has to do with a confrontational style and not enjoying, from what I've read from the service delivery logs and my interacts with mother is that she doesn't want to be told what to do, so be that as it may I cannot say she has had regular and consistent visitation.

"I do note, and I have had the benefit of the service logs, thank you, that the visits when they do occur are very nice. Mother can be charming, generous, playful. I do notice that she does impose on Clare a lot of responsibility for the care of [C.M.] during those visits. And I think somebody mentioned the word parentification somewhere along the line, and certainly there's some indication of that during the visits, and also I'm going to talk about that a little bit later.

"Father has been more consistent.  However, I have to note he's never once made the drive down to have an in-person visit, and if he ever wanted to, that could easily have been arranged if he ever presented himself for an in-person visit.

"I also note that Clare does have these visits with father, but they're often cut short, she does not linger, and she transitions easily, and that's also with her visits with mother, not that they are cut short, but that Clare does not linger, she doesn't seem upset at the end of the visits, et cetera.

"Mother definitely has not met the first criteria, father a little bit more so.

"Looking at the second criteria where the focus is on the child.  I look at the child's age.  Clare is now seven, and she was removed when she was four, just about to turn five.

"So what is the percentage of time spent in each parent's custody, because that is a factor for the Court to look at. Clare apparently spent the first years of her life, before December of 2020, mostly in her mother's care.

"The information and evidence that this court has received that mother lived in the property up in Hayfork, California, where [Clare's father] was, for a period of time.

"I recall asking if they ever lived together, and I think I was told they never lived together, but rather that mother lived in the same vicinity, so it doesn't appear to me that Clare has ever actually lived with [her father].  He says 'yes', mother said 'no', so even if he has, it's never been for a significant period of time.

"What has been the positive and negative effect of interactions between the parent and child?  Well, certainly the visits with father are friendly, but there doesn't appear to be strong, emotional bonding, they often end early,

14

and again, Clare does not seem concerned or upset by the existence or nonexistence of these visits, I'm not aware that she ever asks for them, and that's with respect to father.

"With respect to mother, I'll talk about that in just a moment.

"The next factor under focus on the child is the child's particular needs.

"Now, we do know that when Clare came into our care she had not been in school, she had had very limit[ed] socialization, very limited, if any, medical care, and there was very[,] very significant neglect, and she had been exposed to domestic violence and substance abuse. So this was a child that came into care with pretty high needs. She has since done well, as I evidenced by the teacher's comments.

"Does she still have some emotional issues to address? Yes. Her therapist has diagnosed her with adjustment disorder, unspecified. And of course she's going to struggle with, every child struggles to want to be with a parent no matter what, so I'm not saying that doesn't exist, I'm just commenting that injects the position to her needs.

"Now, looking at the third element, which is would termination of the parental rights be detrimental? In other words, does the detriment outweigh the benefit in the new adoptive home? In other words, how would the child be affected by losing the parental relationship? What would life be like for the child in an adoptive home without the parent in the child's life?

"Clare seems to be doing quite well now in the adoptive home without very significant interaction with her parents.

"And one of the things that really caught my attention when I was looking through the delivery service logs was that there was a relative who expressed an interest in providing long term care for Clare and [E.E.], and that relative may have had other issues, but the issue communicated to the

15

Department was that that relative and other members in the family felt that interference from mother and father would prove to be too destabilizing, too difficult, shall we say, and they declined to proceed with any placement on that grounds. I think also there was an issue of perhaps not being ready to take on that responsibility.

"That was very telling to me, because it relayed that we've experienced the instability of these parents in these proceedings, but it also tells me that the family, who has known them for many many many years, has also experienced it to such a degree that they don't want any part of it.

"So can I say that the preservation of a parental bond, which, as I said, has its challenges here, outweighs the benefit in the new adoptive home? No, I cannot say that.

"Clare is happy, healthy, socialized, and doing well. And while she does have a bond with her mother, I'm not denying that, it is not necessarily a healthy bond.

"She is anxious. She has stated that her resource parent keeps her safe. She has relayed that her mother physically abused her. Those are negative aspects of that relationship.

"So as I look at all of these factors, I consider the arguments made by the Department, I consider the arguments made by all parties, I am finding that the parents have not established that beneficial relationship would exist and that the preservation of that relationship is detrimental as it does not outweigh the benefits in the new adoptive home, so having said all that I'm going to make the findings. . . ."

As to the beneficial parental relationship exception with respect to E.E., the court found:

16

"With respect to the parental bond exception, I understand mother's argument, and I believe that she believes that, I really do. However, the Court has to look at all of the facts.

"Mother's visits with [E.E.] have not been that consistent. Recently she made three of six in the last period. I think overall we're looking at about a 60 to 70 percent overall visits with [E.E.], and I have it sort of broken up into periods of time, but I cannot say that it has been consistent.

"I did look at the visits with [E.E.], and the kids in the delivered service logs, and mother would take [E.E.] out of his stroller and hold him and bounce him, so it's clear that she has affection for him. I can't say that he's exhibited anything other than a friendly adult who doesn't cry when she leaves, he doesn't call for her. Mother has indicated that he tried to nurse, but there was no indication of that in the records, so I don't see a huge bond from him to her.

"In terms of the percentage of time spent in the parent's custody, again, as pointed out, [E.E.] was in mother's care for maybe a month or two of his life, but has been out of her care for the rest of his life, so he certainly does not have a parental relationship with mother at this point.

"Is there any reason that termination of this would be detrimental? I don't think so.

"As I indicated, this is a very young child who sees his resource parent by all accounts as his stable, primary relationship, and I do not think that there is any detriment to [E.E.] by a termination of the parental relationship with mother. [¶] . . . [¶]

"I do think that the benefit of being in an adoptive home clearly outweighs any detriment to this very slight relationship between mother and [E.E.], so I will adopt the recommendations, incorporate the findings on the

17

JV-320, set this matter for a six-month post-permanency review on November 1st of 2022."

Mother filed a notice of appeal.

## DISCUSSION

Mother has filed a 101-page, 24,534-word opening brief that is not only overly long, but poorly organized and written, and difficult to follow.

Under one heading, that "Reversal Is Required Pursuant to the Opinion in *In re Caden C.*," mother makes eight arguments, over 59 pages, with these separate headings: "The Denial of Appellant's Request For A Bonding Study Must Be Reversed"; "The Order Denying The Applicability of the Parental Rights Exception Must Be Reversed"; "Many of the Assertions Made by the [Deputy County Counsel] In Closing Argument Must Be Rejected Because They Introduced Improper Factors Which Influenced The Weighing Process Of The Court"; "The Failure Of The Juvenile Court To Informatively Analyze The Parent-Child Interactions, As Required By *Caden C.* And The Opinion *In M.G.*, Require Reversal Of The Juvenile Court's Finding Here"; "Reversal Is Required Because The Juvenile Court Itself Abused Its Discretion When Applying Improper Criteria Or Having Injected Improper Factors Into the Weighing Process"; "Reversal Is Required Because The Juvenile Court Had Failed In Its Duty To Provide Critical Oversight of The Department"; "The Further Consideration of Improper Factors By the Court When Orally Providing Its Decision Requires Reversal"; and "The Evidence In The Group of DSLs Provided For The Period of 10-5-21 Through 4-21-22 Demonstrates That The Parent-Child Bond Between Clare and Her Mother Supports a Finding That the Parental-Rights Exception To Termination of Parental Rights Applies."

18

Mother's brief nowhere clearly articulates the standard of our review, that we review denial of the motion for a bonding study for abuse of discretion, and the factual finding that mother did not maintain "regular visitation and contact" for substantial evidence. Indeed, the brief mentions "substantial evidence" only twice in its 101 pages, and neither mention serves to explain the standard or apply it to the record before us. Her brief repeatedly intermingles and confuses discussion of each of the three separate prongs of the test set forth in *Caden C.* And the brief concludes with a two-page argument that reversal is required because of an amendment to the minutes indicating that certain of the department's delivered service logs were entered into evidence at the hearing on May 11, 2022.

Because almost all of mother's arguments involve the juvenile court's application of the beneficial parental relationship exception, we turn first to the law of that exception.

**The Beneficial Parental Relationship Exception and *Caden C.***

In *In re Eli B.* (2022) 73 Cal.App.5th 1061 (*Eli B.*), we summarized the applicable law:

"The beneficial relationship test is an exception to the presumptive rule of terminating parental rights after reunification efforts have failed, in order to free a child for adoption. (*In re J.D.* (2021) 70 Cal.App.5th 833, 852 (*J.D.*).) . . . [T]he Supreme Court [in *Caden C.*, *supra*, 11 Cal.5th 614] has recently explained its scope and proper application. [Citation.]

"As clarified by the Supreme Court, ' "the parent asserting the parental benefit exception must show, by a preponderance of the evidence, three things. The parent must show regular visitation and contact with the child, taking into account the extent of visitation permitted. Moreover, the parent must show that the child has a substantial, positive, emotional attachment to

19

the parent—the kind of attachment implying that the child would benefit from continuing the relationship.  And the parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home.  When the parent has met that burden, the parental-benefit exception applies such that it would not be in the best interest of the child to terminate parental rights, and the court should select a permanent plan other than adoption." ' (*J.D.*, *supra*, 70 Cal.App.5th at p. 852, quoting *Caden C.*, *supra*, 11 Cal.5th at pp. 636–637.)

"We review the juvenile court's ruling on the first two elements for substantial evidence.  (*J.D.*, *supra*, 70 Cal.App.5th at p. 853.)  We review its ruling on the third element under a hybrid standard, reviewing its factual determinations concerning the detriment analysis for substantial evidence but its ultimate weighing of the relative harms and benefits of terminating parental rights for an abuse of discretion.  (*Ibid*.)"  (*Eli B.*, *supra*, 73 Cal.App.5th at pp. 1067–1068.)

Under the substantial evidence standard, we " 'must review the whole record in the light most favorable to the [order] below to determine whether it discloses . . . evidence which is reasonable, credible, and of solid value . . . .' " (*In re Angelia P.* (1981) 28 Cal.3d 908, 924, superseded by statute on other grounds as stated in *In re Cody W.* (1994) 31 Cal.App.4th 221, 229–230.) "[A] reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 640.)  "Rather, we draw all reasonable inferences in support of the findings, view the record most favorably to the juvenile court's order, and affirm the order even if other evidence supports a contrary conclusion." (*In re Megan S.* (2002) 104 Cal.App.4th 247, 251; accord, *Caden C.*, at p. 641.)

A juvenile court is not required to recite specific findings of fact relative to its conclusions regarding each of the three elements of the beneficial relationship exception prior to finding the beneficial relationship exception does *not* apply. (*In re A.L.* (2022) 73 Cal.App.5th 1131, 1156.) Although a juvenile court's statement of its findings or an explanation of the reasons for its decision may be helpful in conducting appellate review, it is not a legal requirement. (*Ibid.*) Furthermore, " ' "[w]e must indulge in every presumption to uphold a judgment" ' " (*id.* at p. 1161), including that the court "considered all the pertinent matters presented to it and ruled in favor of the prevailing party." (*Lydig Construction, Inc. v. Martinez Steel Corp.* (2015) 234 Cal.App.4th 937, 945.) Although not required, the court here did make thorough and careful findings of fact relative to its conclusion that the first element of the beneficial relationship exception did not apply—findings that are supported by substantial evidence.

**The Lack of Regular Visitation and Contact Finding Is Supported by Substantial Evidence**

The first prong of *Caden C.*'s test, "regular visitation and contact," has been described as "straightforward." (*Caden C.*, at p. 632.) "The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.' (*In re I.R.* (2014) 226 Cal.App.4th 201, 212.)" (*Caden C.*, at p. 632; *J.D.*, *supra*, 70 Cal.App.5th at p. 852 [" 'The parent must show regular visitation and contact with the child, taking into account the extent of visitation permitted' "].) As noted, this is a factual finding that we review for substantial evidence. (*Caden C.*, *supra*, at p. 639 ["A substantial evidence standard of review applies to the first two elements"]; *J.D.*, *supra*, 70 Cal.App.5th at p. 853.) And critically, a finding that mother did not maintain regular visitation and contact with the children means that the

21

parental relationship benefit exception does not apply. (See *In re I.R.*, *supra*, 226 Cal.App.4th at p. 212 [lack of regular visitation "fatally undermine[s] any attempt to find the beneficial parental relationship exception"]; *In re Katherine J.* (2022) 75 Cal.App.5th 303, 322. fn. 10 ["[A] parent must prove *all three* components of the beneficial relationship exception. A failure of proof on any one of them is fatal"].) The juvenile court's finding on this is supported by the record.

According to the section 366.26 report and its addendum, mother was offered 12 visits in the period from December 15, 2020 to February 11, 2021, then 54 potential visits in the period from February 11, 2021 to October 5, 2021, and then 12 potential visits from October 5, 2021 to the addendum's date of April 19, 2022, for a total of 78 potential visits. Mother missed three, then 26, and then five of those visits, for a total of 34, meaning that mother attended 44 out of 78 potential visits, or 56%—barely more than half. Numerous visits were missed because mother did not call to confirm the visit or simply did not show up. Others were ended early because Clare wanted to "go play." In late April 2021, mother missed four consecutive visits, was pulled from the visit calendar, and did not visit again until the middle of June—a two-month lapse—evidently because she was evading the protective warrant issued with respect to E.E.

Viewing the record in the light most favorable to the juvenile court's order, we conclude substantial evidence supports its finding that mother did not engage in "regular visitation and contact" with the children to " 'the extent permitted by court orders.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 632; see *Eli B.*, *supra*, 73 Cal.App.5th at p. 1070 [substantial evidence supported finding father did not maintain "regular visitation and contact" where his visitation with his children "was sporadic and also entailed significant gaps"];

22

*In re I.R.*, *supra*, 226 Cal.App.4th at p. 212 [error to apply beneficial relationship exception because "[t]he undisputed evidence is that there was not regular visitation"; although precise number of visits was in conflict, testimony of both mother and social workers established there were "significant lapses in visits"].)

To the extent that mother's brief makes arguments directed at the "regular visitation and contact" prong of *Caden C.*'s test, those arguments are unavailing.

First, mother argues that she proved regular visitation and contact by a preponderance of the evidence—a standard that means "evidence that has more convincing force than that opposed to it"—because she attended more than 50% of the potential visits offered by the department. (See 1 Witkin, Cal. Evidence (5th ed. 2022) Burden of Proof and Presumptions, § 36, p. 207.) This argument improperly conflates the two standards. (See *People ex rel. Brown v. Tri-Union Seafoods, LLC* (2009) 171 Cal.App.4th 1549, 1567 ["Preponderance of the evidence means ' "that the evidence on one side outweighs, preponderates over, is more than, the evidence on the other side, *not necessarily in number of witnesses or quantity*, but in its effect on those to whom it is addressed" ' "].)

Second, mother makes several vague challenges to the calculation that she attended 56% of the potential visits, stating that "[t]he record in this case does not explain how it is that the [department's counsel] came up with the claim that the percent of attendance at the visits with Clare were only 56% of the visits offered." We do not understand this argument. The section 366.26 report clearly lists each of the potential visits for the period from disposition through the date of addendum by specific date, explains whether those visits were in person or virtual, and lists the dates of the visits mother did or did

23

not attend.  The report also explains how much visitation was permitted by court order for each of the periods at issue.  What more explanation could there be?

Third, mother focuses on the argument of the department's counsel, asserting that she "misstated the first prong" of *Caden C.*'s test, "failed to provide to the court any analysis of the factual underpinnings of its conclusion that 56% was a correct figure," and going on to disagree with various aspects of department counsel's argument and characterization of the facts.  These arguments are not well-taken, but they all fail for the more fundamental reason that we review the juvenile court's ruling for error, not the parties' trial arguments.  (See *People v. Mason* (1991) 52 Cal.3d 909, 944 ["It is axiomatic that we review the trial court's rulings"]; *Cal-State Business Products & Services, Inc v. Ricoh* (1993) 12 Cal.App.4th 1666, 1676 ["It is axiomatic we review judicial action"].)  The juvenile correctly stated the law as set forth in *Caden C.*, and made a factual finding that mother had not satisfied the first prong of that test—a factual finding that is supported by substantial evidence.

As noted, the balance of mother's arguments go to the other prongs of *Caden C.*'s test:  whether "the child would benefit from continuing the relationship" (§ 366.26, subd. (c)(1)(B)(i)) and whether "termination would be detrimental to the child due to" the relationship (§ 366.26, subd. (c)(1)(B). (*Caden C.*, *supra*, 11 Cal.5th at pp. 632–633.)  For example, mother argues that the juvenile court failed to consider the positive and negative effects of the interaction between parent and child.  Because mother failed to establish the first prong, these arguments do not provide any basis for reversal.  (See *In re I.R.*, *supra*, 226 Cal.App.4th at p. 212; *In re Katherine J.*, *supra*, 75 Cal.App.5th at p. 322, fn. 10.)

24

**The Juvenile Court Did Not Abuse Its Discretion In Declining to Order a Bonding Study**

Mother argues that the trial court erred in declining to order a bonding study, a decision we review for abuse of discretion. (See *In re Lorenzo C.*, *supra*, 54 Cal.App.4th at p. 1341 ["The applicable standard of review is whether, under all the evidence viewed in a light most favorable to the juvenile court's action, the juvenile court could have reasonably refrained from ordering a bonding study"].) As to what such showing of such abuse requires, it has been described in terms of a decision that "exceeds the bounds of reason" (*People v. Beames* (2007) 40 Cal.4th 907, 920), or one that is arbitrary, capricious, patently absurd, or even whimsical. (See, e.g., *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 390 [" ' "arbitrary, capricious, or patently absurd" ' "]; *People v. Benavides* (2005) 35 Cal.4th 69, 88 [ruling " ' "falls 'outside the bounds of reason' " ' "]; *People v. Linkenauger* (1995) 32 Cal.App.4th 1603, 1614 ["arbitrary, whimsical, or capricious"].) In its observation on the subject in a leading case, our Supreme Court said that "A ruling that constitutes an abuse of discretion has been described as one that is 'so irrational or arbitrary that no reasonable person could agree with it.' " (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773.) Or, as that court put it in its most recent definition, "arbitrary or irrational." (*In re White* (2020) 9 Cal.5th 455, 470.)

Mother does not even attempt to show an abuse of discretion. Instead, she relies on *Caden C.*'s statement, while explaining the second element of its test—whether "the child would benefit from continuing the relationship" (§ 366.26, subd. (c)(1)(B)(i))—that in evaluating that second element, "[t]rial courts should seriously consider, where requested and appropriate, allowing for a bonding study or other relevant expert testimony." (*Caden C.*, *supra*,

25

11 Cal.5th at p. 633, fn. 4.) Mother asserts that the juvenile court failed to "seriously consider" allowing a bonding study, but instead "relied upon the fact that there was no 'legal mandate' requiring one." This argument borders on the frivolous. The juvenile court received briefing on the motion for a bonding study, held a hearing on mother's request with argument from the parties' counsel, and gave a detailed explanation on the record for its denial of the motion, including the timing of the request and the juvenile court's 27-month experience with the case. Certainly the court gave mother's request "serious" consideration. In any event, as discussed, because mother failed to demonstrate "regular visitation and contact" under the first prong of *Caden C.*'s test, any error in failing to allow for a bonding study in evaluating the *second* element does not require reversal of the finding that the exception did not apply.[5]

---

[5] By letter dated January 30, 2023, mother's counsel asks to draw our attention to the recent opinion in *In re M.V.* (2023) 87 Cal.App.5th 1155. There, the juvenile court concluded that a bonding study would be helpful and ordered one prepared. (*Id.* at pp. 1168, 1179.) The Court of Appeal found that the study relied on numerous improper factors such that it ultimately produced a "nonresponsive evaluation," and that, in part by relying on the study, the juvenile court considered improper factors in its analysis of the second and third prongs of *Caden C.*'s test. (*Id.* at pp. 1174–1182, 1184–1186.) *In re M.V.* did not concern or discuss the issue here: whether it was appropriate to order a bonding study in the first place. And, as noted, because the juvenile court here found that mother had failed to demonstrate *Caden C.*'s first requirement, *In re M.V.*'s discussion of *Caden C.*'s second and third element is not relevant to the issues before us.

**The Amendment of the Minutes and Admission of the Delivered Service Logs Do Not Provide Any Basis for Reversal**

Mother's final argument, to the extent we understand it,[6] is based on the amendment of the minutes on October 27, 2022 to reflect the admission on May 11, 2022 of an "Exhibit 1," the department's delivered service logs. The argument is apparently based on certain comments by department counsel at the end of the hearing on the bonding study motion, anticipating the evidence to be presented at the then-upcoming section 366.26 hearing, including where she indicated that "all of the case notes from the beginning of the case . . . would, probably, end up being more like 600 pages." But contrary to mother's suggestion that the juvenile court "determined" that it wanted all 600 pages admitted into evidence, the court clearly told the parties that "if you two want to agree as to what I'm going to read, that's what I'll read" and "whatever you two want me to read, I will read." The parties evidently ultimately agreed to provide the court with only a portion of the delivered service logs.

Mother's counsel has also moved to augment the record, "requesting that the [department] be ordered to provide me with the initial two portions of the DSLs for the record, those DSLs being for the initial period, 1-1-21 through 6-14-21, and for the interim period, 6-15-21 through 10-4-21, those being the DSLs which have not yet been provided."

---

[6] The argument states that "[t]he Department has failed [to] ever inform appellant and/or this Court whether what was actually admitted into evidence on May 11, 2022 had included all of the almost 600 pages of the pages which the Juvenile Court had determined it wanted admitted," and that therefore "the Department's insertion must be reversed due to its improper insertion of a document or portions of a document or documents which belong in the record of this Court as to this case and must therefore be Ordered to be provided with it."

According to a declaration of department counsel submitted in opposition to the motion to augment and an attached email addressed to mother's trial counsel, the parties' counsel had agreed to enter the logs "from the past six months" or "from October" into evidence, a document totaling "about 100+ pages" that was attached to the email. Mother's trial counsel responded to that email, indicating that she approved having that document forwarded to the court and marked as an exhibit. Although that document was not initially included in the record on appeal because it was "inadvertently not marked as admitted by the clerk in the minutes," the court clerk subsequently "amended the May 11, 2022 minute order to reflect admission of the case notes and transmitted the case notes to the Court of Appeal in the Supplemental Transmittal of the Record on Appeal dated October 27, 2022." Indeed, on October 27, 2022, the record was augmented pursuant to California Rules of Court, rule 8.340, with approximately 115 pages of delivered service logs dating from October 5, 2021 to April 14, 2022 as well as three pages of minute orders from the May 11 hearing.

In short, the record makes clear that the delivered service logs from the period January 1, 2021 through October 4, 2021 were never entered into evidence and were not considered by the trial court. For that reason, mother's motion to augment the record on appeal is denied. (See California Rules of Court, rule 8.155(a)(1)(A) [record on appeal may be augmented to include "[a]ny document filed or lodged in the case in superior court"]; *Pulver v. Avco Financial Services* (1986) 182 Cal.App.3d 622, 632 ["As a general rule, documents not before the trial court cannot be included as part of the record on appeal and thus must be disregarded as beyond the scope of appellate review"].) In addition, even if the logs were properly part of the record on appeal and tended to show that there was an "exceedingly strong

28

bond between the parent and the child," that would be relevant only to *Caden C.*'s second and third prong.  As discussed, because mother failed to demonstrate the first prong, "regular visitation and contact," the juvenile court's finding that the beneficial parental relationship exception did not apply must still be affirmed.

## DISPOSITION

The juvenile court's order is affirmed.

_____

Richman, J.

We concur:

_____

Stewart, P.J.

_____

Markman, J. *

*In re Clare M.* (A165575)

     \*Superior Court of Alameda County, Judge Michael Markman, sitting as assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.