Filed 6/22/23  P. v. Cunningham CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE, | C094958 |
| Plaintiff and Respondent, | (Super. Ct. No. 20F7298) |
| v. | |
| MICHAEL EDWIN CUNNINGHAM, | |
| Defendant and Appellant. | |

Defendant Michael Edwin Cunningham was charged with various offenses after several witnesses reported that he tried to push his girlfriend out of his car and then ran over her when she fell out.  A jury afterward found him guilty of attempted voluntary manslaughter, assault with a deadly weapon, domestic violence with corporal injury, reckless driving causing serious injury, and a hit-and-run causing injury.  It also found true several enhancements that lengthened the sentence for these offenses.

On appeal, defendant raises five claims.  First, he contends the trial court wrongly instructed the jury that it could consider his prior acts of domestic violence when

1

deciding whether he acted with the intent to kill.  Second, he asserts the court should have instructed the jury that it needed to unanimously agree about the particular acts that constituted attempted voluntary manslaughter, assault with a deadly weapon, and domestic violence.  Third, he asserts we should remand for resentencing because of recent amendments to Penal Code[1] sections 654 and 1170 that became effective after his sentencing.  Fourth, he contends the judgment must be conditionally reversed and the matter remanded to the trial court to determine whether he is eligible for mental health diversion under section 1001.36.  And fifth, to the extent he forfeited his right to mental health diversion in failing to raise the issue before the trial court, he contends he received ineffective assistance of counsel.

We will remand for resentencing and otherwise affirm.

BACKGROUND

Defendant was charged with the attempted murder of his girlfriend, P.C. (§§ 187, 664); assault with a deadly weapon, namely, a Ford Escape (§ 245, subd. (a)(1)); domestic violence with corporal injury (§ 273.5, subd. (a)); reckless driving causing serious injury (Veh. Code, § 23105); and a hit-and-run causing injury (Veh. Code, § 20001, subd. (a)).  He was also initially charged with reckless driving causing injury under Vehicle Code section 23104, subdivision (a), but the prosecution moved to dismiss the charge before jury selection.  The charging document alleged a special allegation for personal infliction of great bodily injury in the course of domestic violence (§ 12022.7, subd. (e)) for all counts but the reckless driving counts and a special allegation for use of a deadly weapon (§ 12022, subd. (b)) for the attempted murder and domestic violence counts.  The charging document also—for the attempted murder, assault with a deadly weapon, and domestic violence counts—alleged that defendant had suffered a prior strike

---

[1] Undesignated statutory references are to the Penal Code.

2

conviction (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(c)) and a prior serious felony conviction (§ 667, subd. (a)) based on an earlier robbery conviction (§ 211).

These charges followed after P.C. was found severely injured in the middle of a road. Several witnesses testified about the events preceding her injury. One witness found defendant stopped in the middle of the road. She called 911 and reported that the driver of a Ford Escape, later identified as defendant, was beating his passenger (P.C.), shoving her, and trying to get her out of the car. Defendant hit P.C. with a closed fist and yelled, "Get out," while P.C.'s legs hung outside the car door. P.C. screamed, "No," and her feet appeared close to touching the roadway. As the witness followed, defendant sped off, stopped (or almost stopped), and sped off again multiple times. As the witness continued following, defendant sped westbound up to 65 "plus" miles per hour on a "[v]ery windy" road and swerved his car left and right, with P.C.'s legs still hanging out of the car. After the witness lost sight of the car for about five seconds, she found P.C. rolling in the road and saw the car speeding away.

Several other witnesses, who were all driving eastbound on the same road, also saw defendant. One said defendant appeared to be trying to push P.C. out of the front passenger door. The car was stopped at the time and P.C. was screaming for help. When the witness stopped to intervene, defendant sped off, nearly hit the witness, and then hit a concrete abutment on the side of the road. The witness afterward saw P.C. lying in the road. A second witness saw defendant traveling at a high and unsafe speed and had to pull over when defendant swerved into his lane. Defendant appeared to be trying to push P.C. out of the open passenger door, with P.C. screaming in fear and hanging outside of the car. Defendant then crashed the car into a guardrail, "sandwich[ing]" P.C. between the car and the guardrail. After, the witness saw P.C. go under the car and then "come out from underneath the vehicle." The car then sped away. A third witness also saw defendant crash into the guardrail with the passenger door open, though, unlike the prior witness, he never saw P.C. hanging out of the door. Defendant swerved into the

3

witness's lane after hitting the guardrail, nearly hit the witness, and returned back to his lane. The witness, looking into his side view mirror, then saw P.C. tumble into the road. A fourth witness also saw defendant driving at high speeds, estimated to be at least twice the speed limit. Defendant nearly hit the witness's car, hit a dirt bank, and then continued on.

P.C. suffered life-threatening injuries and, over the following months, underwent six surgeries. She had a large, "degloving" injury to her stomach (meaning, the skin and subcutaneous tissue had been removed), a large laceration to her spleen (which had to be removed), a spinal fracture, a large pelvic fracture, and exposed intestines and bone. She also had a laceration on her scalp and bruising on her back and left leg. A trauma surgeon later testified that her injuries could have been caused by being thrown or falling from a car or from having been run over by a car.

Three days after these events, a deputy sheriff interviewed defendant. Defendant said he was holding P.C. to prevent her from jumping out of the car while they argued and, after she fell from the car, he felt a bump going down the curb, panicked, and drove away. He also said he was uncertain whether he ran over P.C. and never stopped to check.

Two days after interviewing defendant, the same deputy sheriff recorded an interview with P.C. P.C. said that during their drive, defendant punched her head, shoulders, and back about 12 times during an argument when she sought to get out of the car. Defendant said she could not leave the car, she was his property, and she could wait until they reached their destination. P.C. opened the passenger door to escape, but it swung shut as defendant drove downhill and caught her leg. She reached over to free her leg but then fell out of the car when defendant accelerated. Defendant afterward ran over her with one tire—which P.C. first characterized as purposeful and then as accidental— and drove away. P.C. also described prior domestic violence, saying defendant had "hurt her" before and had been violent in the few months leading up to the offenses charged

4

here. But P.C. said she did not want to press charges, indicating she was afraid defendant would come after her or her family if she reported his crimes.

Several months later, at trial, P.C. said she was still in love with defendant and wished he was not in jail. She then largely recanted her statements to the officer and said she was unconscious until sometime after she spoke with the officer. She said she did not tell the officer that defendant hit her in the car and said she jumped out of the car voluntarily because she had to use the bathroom, defendant was slowing down, and she thought it was safe to exit. She also said defendant never said she was his property, never ran over her, and never pinned her against the bridge railing. She further said defendant checked on her, began to cry, and dialed 911 after she fell out of the car, but then left to avoid being arrested for the "illegal stuff" in the car. As in her earlier interview, she said defendant previously had been violent with her, had shoved her, and had hit her. But this time she said she instigated these physical fights and said defendant never punched her. After reading the transcript of her interview with the officer, however, P.C. said she told the truth for the most part; "too much of the truth," in her telling.

The jury convicted defendant of attempted voluntary manslaughter (the lesser included offense to attempted murder; §§ 192, 664), assault with a deadly weapon, domestic violence with corporal injury, reckless driving causing serious injury, and a hit-and-run causing injury. It also found true the special enhancements concerning use of a deadly weapon and great bodily injury. The trial court afterward found true the allegations that defendant had a prior strike and a prior serious felony conviction. It later sentenced defendant.

Defendant timely appealed in October 2021. Defendant filed his opening brief July 11, 2022. The case became fully briefed in March 2023 was assigned to this panel shortly thereafter.

5

## DISCUSSION

## I

### *Prior Acts*

Defendant's first argument concerns the trial court's jury instructions for his prior acts of domestic violence. P.C., again, told an officer before trial that defendant had "hurt her" before and had been violent in the few months leading up to the offenses charged here. She also, at trial, said defendant previously had been violent with her, had shoved her, and had hit her. On appeal, defendant does not dispute that the trial court properly admitted evidence of these prior acts. But he contends the court wrongly instructed the jury that it could consider these prior acts when deciding whether he acted with the intent to kill P.C. We disagree.

Defendant's prior acts of domestic violence were "uncharged offenses"—that is, offenses that were discussed but not charged in this case. Evidence Code section 1101, subdivision (a) generally bars admission of evidence of these types of offenses to prove the defendant's "conduct on a specified occasion." So, for example, a prosecutor seeking to persuade a jury that a defendant committed an assault on one occasion generally cannot introduce evidence that the defendant also committed another assault on another occasion. Evidence Code section 1101, subdivision (b), however, "provides a limited basis for admission" of this type of evidence. (*People v. Williams* (1988) 44 Cal.3d 883, 904.) It allows the introduction of a defendant's uncharged offenses "when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, [or] absence of mistake or accident . . .) other than his or her disposition to commit such an act." (Evid. Code, § 1101, subd. (b).)

In this case, the trial court initially admitted defendant's prior acts of domestic violence under Evidence Code section 1109, subdivision (a)—a provision that, in a criminal action concerning a defendant's alleged domestic violence, generally allows evidence of the defendant's other acts of domestic violence. But after the close of

6

evidence, the prosecutor asked the court to find these prior acts also admissible under Evidence Code section 1101, subdivision (b). She argued these acts were relevant to show intent, motive, plan or scheme, and absence of mistake or accident. The trial court granted the prosecutor's request, with no recorded objection from defendant, and instructed the jury accordingly. Per the jury instructions, if the jury found defendant committed these prior acts, it could consider them "for the limited purpose of deciding whether the defendant acted with the intent to kill [P.C.], . . . the defendant had a motive to commit the offenses alleged in this case, . . . the defendant's alleged actions were not the result of mistake or accident, or the defendant had a plan or scheme to commit the offenses as alleged in this case."

Challenging the trial court's decision in part, defendant asserts the court wrongly found his prior acts of domestic violence relevant to show his intent to kill. He reasons that these prior acts would be relevant only if he harbored an intent to kill on these prior occasions. He asserts this follows from our Supreme Court's decision in *People v. Ewoldt* (1994) 7 Cal.4th 380, which stated: "[T]o be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." ' " (*Id.* at p. 402.)

We find defendant's reliance on this general language from *Ewoldt* misplaced. In the years before *Ewoldt*, courts had repeatedly admitted evidence of a defendant's prior assaults on a romantic partner to establish intent in a later murderous assault, even when the defendant lacked an intent to murder in these prior assaults. In *People v. Cartier* (1960) 54 Cal.2d 300, for instance, our Supreme Court found the trial court properly admitted evidence that a witness saw defendant's wife run onto her porch six weeks before her death and then saw defendant come out after her and pull her back into the house. (*Id.* at p. 311.) The court reasoned that "[e]vidence tending to establish prior quarrels between a defendant and decedent and the making of threats by the former is properly admitted and is competent to show the motive and state of mind of the

7

defendant." (*Ibid.*) The Court of Appeal in *People v. Zack* (1986) 184 Cal.App.3d 409, to give another example, later found similarly, stating: "Where a defendant is charged with a violent crime and has or had a previous relationship with a victim, prior assaults upon the same victim, when offered on disputed issues, e.g., identity, intent, motive, et cetera, are admissible based solely upon the consideration of identical perpetrator and victim without resort to a 'distinctive modus operandi' analysis of other factors." (*Id.* at p. 415.)

These principles, as the court in *People v. Linkenauger* (1995) 32 Cal.App.4th 1603 explained, "survive[] *Ewoldt*." (*Id.* at p. 1613 [discussing *People v. Zack*].) *Linkenauger* involved a defendant's alleged murder of his wife. (*Id.* at p. 1606.) The trial court there admitted evidence "concerning marital discord and [the defendant's] prior assaults" on his wife, including defendant's prior assault on his wife in a parking lot and bruises that friends had seen on his wife's face, neck, and arms in prior years. (*Id.* at pp. 1608-1609.) The trial court reasoned this evidence was admissible to show, among other things, the defendant's intent to kill his wife. (*Id.* at p. 1608.) On appeal, the defendant argued the trial court's ruling was inconsistent with the then-recent decision in *Ewoldt*. (*Id.* at p. 1612; see *id.* at p. 1608.) But the Court of Appeal disagreed. It found "[t]he general rules promulgated in *Ewoldt* are not here controlling"—in part because *Ewoldt* did not involve a violent crime—and further found, "a broader range of evidence may be presented to show motive, intent, and identity where the prior misconduct and charged offense involves the identical perpetrator and victim." (*Id.* at p. 1613.) It then concluded the evidence of marital discord and the defendant's prior assaults on his wife was admissible because it tended to show he intended to murder his wife. (*Ibid.*)

Our Supreme Court subsequently found similar evidence admissible in *People v. San Nicolas* (2004) 34 Cal.4th 614, another case involving a defendant's alleged murder of his wife. (*Id.* at p. 624.) The trial court there, among other things, admitted evidence that shortly before his wife's murder "the defendant held his wife on the bed while she

8

was crying and said, 'Leave me alone.' " (*Id.* at p. 668.)  On review in our Supreme Court, the defendant challenged the trial court's instruction that the jury could consider this and another act to show, among other things, intent.  (*Ibid.*)  But the court rejected the defendant's challenge.  It found the prior acts of misconduct "shed light on defendant's motive, identity, and intent to murder his wife." (*Ibid.*)  It then, quoting pre-*Ewoldt* case law, explained that " '[e]vidence tending to establish prior quarrels between a defendant and decedent and the making of threats by the former is properly admitted . . . to show the motive and state of mind of the defendant.' " (*Ibid.*; see also *Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 586 [finding the trial court correctly concluded that evidence of the defendant's prior abuse of his wife, including prior slapping and striking, was relevant to show the defendant's intent in the murder of his wife].)

Consistent with this post-*Ewoldt* case law, we find defendant's prior abuse of P.C. "shed light on [his] . . . intent to murder" P.C. and was admissible under Evidence Code section 1101, subdivision (b), even if defendant did not harbor an intent to kill when he committed this prior abuse.  (*People v. San Nicolas, supra*, 34 Cal.4th at p. 668.)  We also find defendant's effort to distinguish this case law—particularly, *Linkenauger*—unpersuasive.  He argues *Linkenauger* is distinguishable because the defendant there had previously threatened to kill his wife.  But in *Linkenauger*, none of the admitted evidence concerning prior domestic violence involved a threat of any sort.  On one occasion, for instance, the defendant "beat [his wife] and left her in [a] parking lot," without making any apparent threat.  (*People v. Linkenauger, supra*, 32 Cal.App.4th at p. 1609.)  On several other occasions, to give another example, several friends "observed bruises on [the wife's] face, neck, and arms"—again, with no mention of any threat.  (*Ibid.*)  The court still found all this evidence relevant to show the defendant intended to murder his wife.  (*Id.* at p. 1613.)  We reach a similar conclusion here.

9

## II

### *Unanimity*

Defendant next contends "[t]he trial court prejudicially violated [his] rights to a unanimous jury and due process by failing to instruct sua sponte that the jury must agree unanimously on which acts constituted attempted murder or attempted voluntary manslaughter, assault with a deadly weapon, and domestic violence." He reasons that multiple alleged acts could have constituted each of these crimes, including his driving in an attempt to eject P.C. from the car, slamming P.C. into a bridge guardrail, and running over P.C. We reject his argument.

Under the state and federal Constitutions, a unanimous jury verdict is required to convict a person of a crime. (*Ramos v. Louisiana* (2020) ___ U.S. ___ [140 S.Ct. 1390, 1397]; *People v. Russo* (2001) 25 Cal.4th 1124, 1132 (*Russo*).) This requirement is typically satisfied when the jury unanimously finds the defendant committed the alleged crime. But that is not always the case. As our Supreme Court has explained, "when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act." (*Russo*, at p. 1132.) This requirement " 'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.' " (*Ibid.*)

This rule, however, has "several exceptions." (*People v. Jennings* (2010) 50 Cal.4th 616, 679.) Even when the evidence suggests more than one discrete crime, for instance, no unanimity is required if " ' "the acts alleged are so closely connected as to form part of one transaction." ' " (*People v. Williams* (2013) 56 Cal.4th 630, 682.) This exception—the "continuous conduct" exception—" 'applies when the defendant offers essentially the same defense to each of the acts, and there is no reasonable basis for the jury to distinguish between them.' " (*Ibid.*) Our Supreme Court has characterized this as one of several exceptions to the requirement for a unanimity instruction (*Jennings*, at p.

10

679), though as one Court of Appeal has observed, it might be better "to say that, in this situation, a unanimity instruction is required, but the failure to give one is harmless" (*People v. Lueth* (2012) 206 Cal.App.4th 189, 196).

No unanimity instruction is required, moreover, when "the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed or what the defendant's precise role was." (*Russo, supra*, 25 Cal.4th at p. 1132.) So, for example, in a case involving an alleged conspiracy to commit a crime, the evidence may show the defendants committed various overt acts in furtherance of the conspiracy—with an overt act being a required element of the crime of conspiracy. But because one agreement to commit a crime can support only one count of conspiracy, the jury need not agree on any specific overt act to convict. (*Id.* at p. 1135.) Although it must find at least one overt act to convict in these circumstances, whether it finds "one or another of several possible acts only concerns the way in which the crime was committed, i.e., the theory of the case, not whether discrete crimes were committed." (*Ibid.*) On the other hand, to give a different example, if the evidence showed burglaries of two distinct homes and so two discrete crimes, the jury would have to unanimously find the defendant committed at least one of these acts before finding the defendant guilty. (*Id.* at pp. 1132-1133.)

Here, the trial court declined to provide a unanimity instruction because, it said, the prosecution had been consistent throughout the trial that the charges were premised on a single course of conduct involving a single stretch of a single drive. Challenging the court's decision, defendant contends a unanimity instruction was required because the testimony concerning this drive evidenced multiple potential attempted manslaughters, multiple potential assaults with a deadly weapon, and multiple potential acts of domestic violence with corporal injury. Given these multiple potential crimes, he argues, "the jury should have been instructed to unanimously agree beyond a reasonable doubt that one of the alleged acts was committed." He adds that a unanimity instruction was particularly

11

warranted because "there is a reasonable basis for the jury to distinguish the acts alleged that could prove attempted voluntary manslaughter, assault with a deadly weapon, and domestic violence." He reasons, it appears, that although the prosecution relied on various alleged acts in arguing he committed these crimes—namely, his driving in an attempt to eject P.C. from the car, slamming P.C. into the guardrail, and running over P.C.—the evidence for the latter two acts "was weak."

We reject defendant's argument, considering each offense separately. Starting with the offense of assault with a deadly weapon, the evidence supported at most a single conviction for assault with a deadly weapon, not multiple potential convictions, as defendant believes. As our Supreme Court long ago explained, when a defendant assaults a single victim with a deadly weapon in "one continuous transaction," he or she has committed at most one assault with a deadly weapon. (*People v. Oppenheimer* (1909) 156 Cal. 733, 739-740.) That is true even if the defendant swung the weapon multiple times and even if multiple deadly weapons were used. (See *id.* at p. 740.) And although there may be potential disagreement about the means a defendant used to commit an assault with a deadly weapon—as in *Oppenheimer* when the evidence showed the use of multiple arguably deadly weapons (*id.* at p. 739)—that in itself does not require a unanimity instruction. That is because "where the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed or what the defendant's precise role was, the jury need not unanimously agree on the basis or, as the cases often put it, the 'theory' whereby the defendant is guilty." (*Russo, supra*, 25 Cal.4th at p. 1132; see *People v. Williams, supra*, 56 Cal.4th at p. 682, fn. 31.)

The same logic applies to the attempted voluntary manslaughter offense. Here too the evidence supported at most a single conviction for attempted manslaughter, not multiple convictions. A defendant may, in the heat of passion or a sudden quarrel, make several attempts to kill in a single transaction involving a single victim. But even then,

12

he or she has committed at most one attempted voluntary manslaughter. (Cf. *People v. Oppenheimer, supra*, 156 Cal. at p. 739; *Bell v. United States* (1955) 349 U.S. 81, 84 [when the unit of prosecution is unclear, "doubt will be resolved against turning a single transaction into multiple offenses"].) To convict for attempted voluntary manslaughter under these types of facts, the jury must agree the defendant took a direct but ineffectual step toward killing a person. (§ 21a.) But it need not agree about the particular step the defendant took. (See *Russo, supra*, 25 Cal.4th at p. 1132; see also *United States v. Hofus* (9th Cir. 2010) 598 F.3d 1171, 1176-1177 [while the jury needed to unanimously agree that the defendant took a substantial step toward the commission of the crime (there, the attempt to coerce and entice a minor to engage in sexual activity), it did not need to "agree as to which particular act by the defendant constitutes a substantial step"].)

Turning to the offense of domestic violence with corporal injury, we acknowledge the law is more complicated for this offense. At least one Court of Appeal, for instance, has found several separately inflicted injuries in a single fight could support several convictions for domestic violence with corporal injury. (*People v. Johnson* (2007) 150 Cal.App.4th 1467, 1477.) But even if that is true, defendant has still not shown a unanimity instruction was required here. The jury unanimously found both elements of this offense were satisfied. It found defendant willfully and unlawfully inflicted a corporal injury on his girlfriend and the injury he inflicted resulted in a traumatic condition. Defendant argues the jury also needed to unanimously agree on the means that he used to "cause[] the traumatic injury." But when a defendant has caused *a* traumatic injury, and the only potential disagreement concerns how precisely the defendant caused that singular injury, no unanimity instruction is required. (*Russo, supra*, 25 Cal.4th at p. 1132; *People v. Lueth, supra*, 206 Cal.App.4th at p. 199 [although "the jurors could have disagreed with respect to whether this bump was inflicted with a tire iron or with a fist," "this would merely be a disagreement over exactly how the crime was committed"].)

13

# III

## *Sentencing*

Defendant asserts we should remand for resentencing because of recent amendments to sections 654 and 1170 that became effective after his sentencing. We agree, as do the People, that remand is appropriate because of a recent amendment to section 654. Because defendant will be able to raise any additional sentencing claims he may have on remand, we need not address his additional arguments premised on section 1170.

At the time of sentencing, section 654, subdivision (a) stated: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (Stats. 1997, ch. 410, § 1.) Based on this language, the trial court here imposed sentence for the attempted voluntary manslaughter offense—the offense carrying the longest potential term of imprisonment—and imposed but stayed sentence for the offenses of assault with a deadly weapon and domestic violence with corporal injury. (See §§ 664, subd. (a), 245, subd. (a), 273.5, subd. (a).) But following a recent amendment in Assembly Bill No. 518 (2021-2022 Reg. Sess.), section 654 now allows courts to choose the punishment to impose in these types of cases, stating: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions." (Stats. 2021, ch. 441, § 1, eff. Jan. 1, 2022.) Defendant contends, correctly, that we should remand to allow the trial court to exercise its newly authorized discretion under section 654.

New criminal laws generally operate only prospectively unless the enacting body "expressly" declares a contrary intent. (§ 3.) But not always. "[U]nder [*In re Estrada* (1965) 63 Cal.2d 740], ' "[a]n amendatory statute lessening punishment is presumed to apply in all cases not yet reduced to final judgment as of the amendatory statute's

14

effective date" [citation], unless the enacting body "clearly signals its intent to make the amendment prospective, by the inclusion of either an express saving clause or its equivalent" [citations].' " (*People v. Lara* (2019) 6 Cal.5th 1128, 1134; see also *People v. Nasalga* (1996) 12 Cal.4th 784, 789, fn. 5 ["a judgment is not final until the time for petitioning for a writ of certiorari in the United States Supreme Court has passed"].)

This presumption favors retroactive application of section 654's new language in this case. The Legislature's recent changes to section 654 potentially lessen punishment for those like defendant. And in making these changes, the Legislature evidenced no intent to have these changes apply prospectively only. For these reasons, and because the statutory amendment became effective before defendant's appeal became final, we agree he is entitled to the statute's ameliorative benefit. And because we cannot predict how the trial court would have acted had this amendment been in effect at the time of sentencing, we find remand appropriate to allow the trial court to exercise its newly authorized discretion under section 654. (See *People v. Mani* (2022) 74 Cal.App.5th 343, 379-381 [concluding that Assem. Bill No. 518 applies retroactively and remanding to the trial court for resentencing].) On remand, defendant will be entitled to a full resentencing. (*People v. Buycks* (2018) 5 Cal.5th 857, 893.)

IV

*Pretrial Mental Health Diversion*

Lastly, defendant contends the judgment must be conditionally reversed and the matter remanded to the trial court to determine whether he is eligible for "pretrial" mental health diversion under section 1001.36. He adds that, to the extent the claim is forfeited because it was never raised before the trial court, his trial counsel provided ineffective assistance of counsel. We find the claim forfeited and reject defendant's claim of ineffective assistance.

We start with forfeiture. The Legislature enacted section 1001.36 in 2018. (Stats. 2018, ch. 34, § 24, eff. June 27, 2018.) The statute "authorizes a pretrial diversion

15

program for defendants with qualifying mental disorders" (*People v. Frahs* (2020) 9 Cal.5th 618, 623, 626) and defines "pretrial diversion" to "mean[] the postponement of prosecution, either temporarily or permanently, at any point in the judicial process from the point at which the accused is charged until adjudication, to allow the defendant to undergo mental health treatment," subject to certain limitations. (§ 1001.36, subd. (f)(1).)

Defendant never sought diversion under this statute at the trial court level. But on appeal, he claims he can still pursue "pretrial diversion" because his judgment is not yet final. At the very least, he argues, he can pursue diversion when this case is remanded for resentencing. We disagree. As our Supreme Court recently explained, a defendant must seek diversion under section 1001.36 "before attachment of jeopardy at trial or the entry of a guilty or no contest plea, whichever occurs first." (*People v. Braden* (Jun. 5, 2023, S268925) ___ Cal.5th ___ [2023 Cal. LEXIS 3021 at *1].) Because that time has passed, defendant can no longer pursue diversion under this statute.

We turn next to defendant's claim of ineffective assistance of counsel. To support a claim for ineffective assistance of counsel, the defendant must (1) "show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms," and (2) "show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different." (*People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*).) Although establishing ineffective assistance of counsel is often difficult, it is "particularly difficult" on direct appeal. (*Ibid.*) "On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*Ibid.*)

16

Because defendant has not made any of these required showings to support reversal on direct appeal, we decline to find that his counsel provided ineffective representation. Nothing in the record "affirmatively discloses [that his] counsel had no rational tactical purpose for the challenged act or omission." (*Mai, supra*, 57 Cal.4th at p. 1009.) Nor does anything in the record show that his "counsel was asked for a reason [for his acts or omissions] and failed to provide one." (*Ibid.*) And although defendant asserts "[t]here is no conceivable rational tactical justification for having failed to request a hearing before sentencing," we find differently.

The record of defendant's mental health condition is limited, with defendant relying on only one page of the probation report. It says he was diagnosed with posttraumatic stress disorder, bipolar disorder, and antisocial personality disorder "[w]hile in prison," with his first prison term starting over five years before the offenses here. It adds that defendant is not currently receiving treatment or medications. But defendant cites nothing in the record suggesting that, as required under section 1001.36, he would have agreed to comply with treatment as a condition of diversion. (§ 1001.36, subd. (c)(3).) Nor does the record show, as further required under section 1001.36, that "defendant's mental disorder was a significant factor in the commission of the charged offense." (*Id.*, subd. (b)(2).) It shows instead, per the probation report, that defendant attributed his conduct to bad drugs.

Considering defendant's limited showing, we are not persuaded that trial counsel had no rational tactical purpose for failing to request diversion under section 1001.36. If there is extra-record evidence that defense counsel was indeed ineffective in failing to seek diversion under section 1001.36, defendant may pursue his claim through a writ of habeas corpus. (*Mai, supra*, 57 Cal.4th at p. 1009.)

17

DISPOSITION

The sentence is vacated and the matter is remanded to the trial court for a full resentencing. The judgment is otherwise affirmed. Following resentencing, the trial court shall prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation.

                                  /s/
                             BOULWARE EURIE, J.


We concur:


     /s/
RENNER, Acting P. J.


     /s/
McADAM, J.*

---

\* Judge of the Yolo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

18